**SIERRA CLUB et al., Plaintiffs,**

v.

**Bob BERGLAND, Secretary, United States Department of Agriculture, et al., Defendants.**

**No. WC 78–22–K.**

United States District Court,
N. D. Mississippi, W. D.

April 17, 1978.

David G. Hill, Oxford, Miss., for plaintiffs.

Wm. M. Dye, Jr., Asst. U. S. Atty., Oxford, Miss., William C. Spencer, Holly Springs, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Plaintiffs, the Sierra Club and six individual members thereof, bring this action for declaratory and injunctive relief against the Secretary, United States Department of Agriculture (USDA), the Assistant Secretary for Conservation, Research and Education of USDA, the Administrator, Soil Conservation Service (SCS), the Deputy Administrator for Programs, SCS, Assistant Administrator of Water Resources, SCS, State Conservationist for SCS (collectively referred to as federal defendants), as well as Tippah River Drainage District of Benton and Marshall Counties, Marshall County Soil and Water Conservation District, Benton County Soil and Water Conservation District and Tippah County Soil and Water Conservation District, seeking to halt the proposed channel improvement of a section of the Tippah River Watershed which flows through Tippah, Benton and Marshall Counties in North Central Mississippi. Plaintiffs have applied for preliminary injunction, on which an evidentiary hearing was conducted April 6, 1978. The awarding of the contract by SCS for its portion of the work has been deferred until April 19, to allow the court an opportunity to make its decision. After careful consideration of the evidence presented at that hearing, along with legal memoranda submitted by counsel, we proceed to address the merits of plaintiffs' motion for preliminary relief.

## NATURE OF PROJECT

The project that plaintiffs seek to halt, affecting both government and privately owned land located along the Tippah River Channel, is a joint venture by the United States Army Corps of Engineers (Corps) and SCS. The responsibility for the development of the project, however, is solely that of the latter agency. As presently designed by SCS, the project calls for the removal of silt deposits of approximately 410,000 cubic yards over a 6.6 mile section of the lower Tippah Channel at a point near its convergence with the Tallahatchie River, which leads into the Sardis Reservoir. Approximately 60% of the work (268,700 cubic yards) is to be done on Corps property within the Sardis Reservoir boundary, and the other work being the excavation of 141,300 cubic yards from privately owned land. The work to be performed on the federal land is authorized by "congressional directions to keep open the streams which run into Sardis Lake", pursuant to 33 CFR § 209.145. The work on private property is sought to be authorized as ameliorating a sudden impairment of the watershed justifying emergency relief authorized and funded through appropriations under § 216 of the Flood Control Act of 1950, 33 U.S.C. § 701b–1; 33 CFR § 320–29. The Corps has assumed responsibility for administering both portions of the work for the granting of a § 404 permit pursuant to the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1344, and in accordance with federal regulations entitled "Federal Projects Involving the Disposal of Dredged Material in Navigable and Ocean Waters," 33 CFR § 209.145. Acting pursuant to the latter authority, the District Engineer, after public hearing, made findings of fact and a determination supporting the issuance of a § 404 permit by an environmental assessment made in accordance with a document entitled "Emergency Assistance as Authorized by Section 216 of the Flood Control Act of 1950." (Deft. Ex. 2). The federal

officials have not prepared a § 102 environmental impact statement (EIS) as contemplated by the national Environmental Policy Act (NEPA), 42 U.S.C. § 4332.

The issues to be resolved in determining plaintiffs' request to secure preliminary injunctive relief are as follows: First, we must decide whether and, if so, to what extent, the administrative decisions which plaintiffs challenge are reviewable in this court under the Administrative Procedure Act (APA) 5 U.S.C. § 701 et seq. Secondly, in the event that APA does not preclude judicial review, we must determine if SCS is legally authorized to proceed under § 216 of the Flood Control Act, i. e., whether the sediment buildup in that portion of the Tippah River Channel in issue justified the development of the project as emergency relief from floods causing a sudden impairment of the watershed within the meaning of § 216. Only if this second issue is resolved against the defendants will it be necessary to determine whether the procedural requirements of NEPA are applicable to the channel improvement.

## I. APPLICABILITY OF § 216, FLOOD CONTROL ACT OF 1950

### (a) *Reviewability*

■ Unquestionably, the determination of the District Engineer to grant a § 404 permit is final agency action, no less than the determination of the Secretary of Agriculture, through his designee, SCS, to utilize § 216 funds for the Tippah River project; thus, these decisions are subject to the provisions of the Administrative Procedure Act. Title 5 U.S.C. § 701(a) provides in relevant part that APA applies ". . . except to the extent that— . . . (2) agency action is committed to agency discretion by law." Section 704 expressly provides "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court is subject to judicial review." The scope of judicial review is provided by § 706, the pertinent portions of which are as follows:

The reviewing court shall— . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

■ It is familiar law that any conflict which may exist between § 701(a)(2), in cases where agency discretion is involved, and § 706(2)(A), providing for judicial review, should be resolved in favor of judicial review. *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There, the Supreme Court held that the "committed to agency discretion" exception is very narrow. 401 U.S. at 410, 91 S.Ct. 814. It was made clear that only reasonably exercised discretion may be committed to a federal agency, and unreviewability of discretion exists only in those instances "where statutes are drawn in such broad terms that in a given case there is no law to apply." Id. The *Overton Park* decision reaffirmed the principle enunciated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), that the right of judicial review of final agency action is presumed unless such review is either specifically excluded by statute or in those special situations where there is a lack of ascertainable standards which makes judicial review impracticable. Moreover, the Court in *Abbott* held that the presumption of reviewability may be defeated only by "clear and convincing evidence" of a contrary legislative intent. 387 U.S. at 141, 87 S.Ct. 1507.

Guided by the foregoing principles, we are confronted with the express language of § 216, the statutory authority upon which both SCS and the Corps rely in this case. The relevant portion of that statute

provides that the Secretary of Agriculture, or his designee, has authority

. . . *in his discretion to undertake such emergency measures for run-off retardation and soil-erosion prevention as may be needed to safeguard lives and property from floods and the products of erosion on any watershed whenever . . any . . . natural element or force has caused a sudden impairment of that watershed.* (Emphasis added)

Even a cursory examination of this statute reveals that there are ascertainable standards of judicial review, or "law to apply." Though vested with discretion, the Secretary of Agriculture, or his agents, nonetheless can undertake emergency measures only when the conditions specifically set forth in the statute have been found to exist. While we are disinclined to interfere with exercise of administrative discretion, we have the clear duty to examine the specific criteria of this statute in reviewing the propriety of the agency action. This means that the Secretary is authorized to undertake emergency measures only as may be needed to safeguard lives and property where floods have caused a sudden impairment of the watershed. More specifically, we must address the issue of whether the defendants are supported by the record in their determination that there was a sudden impairment of the Tippah River segment under review as a result of 1973 flooding to justify emergency action needed to safeguard lives and property for run-off retardation and to prevent soil erosion, and the products of soil erosion upon the watershed.

### (b) *Standing*

■ Indisputably, plaintiffs have standing to maintain this action from the facts set forth in the joint stipulation (Exh. 1) which acknowledges that the Sierra Club has 450 members in Mississippi, with a chapter of 36 members who meet regularly at Oxford, and that the individual plaintiffs, all of whom are Sierra Club members, are actual users of the facilities and recreational opportunities of Sardis Reservoir, which is the culmination of the Tippah River watershed and other tributaries in northeast Mississippi. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

### (c) *Facts*

From the evidence adduced at the hearing, the court finds the following essential facts.

In 1966 SCS conceived and executed a channel excavation of Tippah River for a length of 57 miles extending from its western terminus at the mouth of the Tallahatchie River and proceeding generally northeasterly to its various headwaters in Tippah, Benton and Marshall Counties, Mississippi. Sections of the original channelization were situated in each of the four local defendant drainage, soil and water conservation districts. As a direct result of the major channelization, the velocity of Tippah River was measurably increased, thus causing greater quantities of sediment to be carried downstream. This was a process to be naturally expected from a channelization of such character and resulted in bank caving and sand overflow in the headwater regions. Proper maintenance was necessary to avoid buildup of erosion and sedimentation deposits being carried downstream and deposited to obstruct runoff. The four local soil conservation districts undertook no maintenance work of any kind except to cut willows, nor did SCS make any expenditures to maintain the excavated channel to avoid predictable adverse effects to the altered watershed. By 1970 the drainage districts and the SCS had a series of discussions with the Corps regarding excavation of the Tippah River outlet channel adjacent to the Sardis Reservoir. At that time, the Corps' conclusion was that reexcavation would worsen the overall condition of the Tippah watershed and that filling of the channel at the location complained of was the result of upstream channel development and not conditions created by Sardis Reservoir (Pltf. Ex. 6). Moreover, the Corps' position was that it would not do additional work until the physical conditions in the Sardis Reservoir

permitted same, without risking recurring adverse effects of bank scour and caving, as well as erosion problems upstream, and downstream filling. In May 1972, further discussion took place between the local district, SCS, and the Corps regarding further work to be done in the Sardis Reservoir during the summer of 1972. It was thought that banks should be stabilized sufficiently in that area to relieve "severe flooding to adjacent landowners in the upstream area" (Pltf. Ex. 7, 8). On July 18, 1972, the local districts, Corps personnel and SCS met at New Albany, at which time Commissioner Davis explained that "during a flood stage on the Tippah River the farming areas adjacent to the river are flooded to a drastic extent." The Corps representatives advised those present that further channelization at that time would be only a temporary solution and would not permanently prevent flooding and sedimentation in the lower reaches of the Tippah River, upstream of the Corps' boundary line. SCS and Corps representatives went on a field trip of the affected segment, finding many areas along banks where sand had been deposited by overbanking upon adjoining land. It was SCS's determination that the banks of the Tippah River had stabilized, and that the channel in the vicinity of the concrete bridge on the Corps property had filled approximately 8 to 10 feet since the original excavation completed in 1966 (Pltf. Ex. 9). In August 1972, Chancellor W. H. Anderson appealed to Congressman Whitten about the sedimentation accumulating in the Tippah watershed and ascribed this condition to the Corps' failure to provide a proper outlet. The Chancellor was advised by the local commissioners "that from the end of the canal back north the canal is filling up with sand and for a distance sand is at least 10 feet deep in the channel" (Pltf. Ex. 10). The evidence, however, refutes any implication that the Corps was responsible for the sedimentation buildup due to its failure to excavate in the mouth of the Sardis Reservoir. At the time of the original channelization of the Tippah watershed leading into the mouth of the Tallahatchie River, also the entrance to Sardis Reservoir, the excavation had been done in accordance with plans then approved by SCS, as well as the Corps. After appeals were made to Congressman Whitten in 1972, he was advised by the District Engineer that at the time of the original excavation "an adequate outlet for tributary drainage into the Sardis Lake had been provided at Corps expense," also that subsequent experience had shown that the headwater tributaries to the Tippah watershed had resulted in continuing sedimentation and filling of the lower reaches of the Tippah River, and the increased velocity provided by the enlarged channel was transporting vast quantities of sand and silt downstream with the ultimate deposition into the maximum flood pool areas of the Sardis Lake (Pltf. Ex. 12). It is manifestly clear that the Corps was, by September 1972, seriously concerned with the flooding problems being encountered by landowners as the result of overflows of the Tippah River channel at upstream locations. The Corps advised Whitten it would make further studies to reassess the entire matter of tributary drainage and would, jointly with the SCS, reassess the matter of tributary drainage into the four large North Mississippi reservoirs, Sardis, Enid, Grenada and Arkabutla.

The Tippah River watershed was, without doubt, subject to frequent floodings in 1973, as well as in 1974 and 1975. Certain landowners continued to experience, as they had theretofore experienced, difficulty in planting crops, raising livestock, and making productive use of no less than 5500 acres of land located directly in the flood plain of the Tippah River channel, and substantial quantities of water overflowed upon lands which had been theretofore productive, leaving more sand deposits. Because of continuing sedimentation and erosion problems, the local drainage and soil conservation districts, in October 1973, applied to the SCS for federal emergency relief under § 216 (Deft. Ex. 7).

In 1976, the soil conservation officials consulted K. M. Hayward, head of the State Design Unit, who, with Peter Forsythe, viewed the troubled area to determine if

the 1973 flooding could constitute a basis for an emergency clean-out project. From four cross sections furnished to him showing sediment accumulation in the lower reaches of the Tippah River, Hayward developed a profile of the river, concluding that there is "less than a foot of fill in most of the sections from the survey data of the 1972 cross sections to the survey data of the 1975 cross sections." Hayward concluded this quantity, if spread over a length of 6½ miles, would result in a depth cut of less than one foot over a very wide channel bottom and he concluded "this small amount of clean-out would be almost impracticable to perform. We are of the opinion that essentially no clean-out work is necessary to return the channel to the conditions prior to the March 1973 storms."

Hayward also expressed the view that "since there is almost no material deposited as a result of the 1973 flood in the area where we have cross sections, it would be difficult to develop plans for the removal of this small amount. There may be some sediment on the lower end that was caused by the 1973 floods; however, we do not have cross sections with which to compare this area." (Pltf. Ex. 15). The foregoing report was addressed to H. P. Fulmer, Deputy State Conservationist whose superior was then Dr. Heard.

Hayward testified at trial that significant sediment deposits were found between those ranges as a result of surveyed cross sections taken at 1000 foot intervals in March 1976; but he had no data with which to compare the pre-1973 accumulation of sediment in these areas. Thus, we believe his revised opinion is of little probative value. Indeed, Mike Dawson, who testified at trial, submitted a report in which he stated:

Legally [SCS] can remove only the sediment that built up after the 1973 flood. They claim this is 8 feet. However, no cross-sectional profiles were taken between the original work in 1967 and 1976.

When asked how they knew that most of the sediment had built up since 1973, the SCS answered that it was their "professional judgment". The Corps has data on the Yalobusha and Skuna Rivers (both run into Grenada Lake) that indicates most of the sediment buildup in these rivers occurred in the first few years after channelization. (Plt. Ex. 17).

SCS proceeded to study the feasibility of granting emergency assistance under § 216 and ultimately proposed further channelization of the Tippah watershed, in conjunction with the Corps, since both government property and privately owned property would be involved in the project. Initially, the new project contemplated the excavation of some 1,100,000 cubic yards of sediment. SCS' determination was reviewed by a team from the national SCS charged with making inspection reports on projects listed for emergency watershed protection. The report of this inspection which was carried out in April 1977 (Pltf. Ex. 16), made these significant findings:

(a) The Soil Conservation Service proposes to fund its work from supplemental appropriations obtained under the authority of Section 216 of Public Law 81–516, the Flood Control Act of 1950. Following the storm of March 1973, supplemental funds were appropriated for the work in this area. However, Section 216 provides authority only to undertake such emergency measures as may be needed to safeguard lives and property from floods and the products of erosion whenever a natural element or force has caused a sudden impairment of the watershed. In the case of these four subwatersheds,* evidence indicates that sediment accumulation has been gradual since the time of construction and did not occur suddenly as a result of the 1973 storm. Further, it appears the only "Hazard" is to adjacent land which will be flooded more frequently resulting in loss of crops, sediment deposition, and some "swamping."

* The four watersheds are: Cold Water-Pidgeon Roost, Tippah, Skuna and Yalobusha River Watersheds.

(b) The lower reaches of the four aforementioned streams are aggrading and the upstream reaches are degrading. The inspection team feels that to remove sediment from the lower reaches is only a partial and temporary solution. Upstream stabilization measures should receive priority since the critical sediment sources are in the upstream reaches.

(c) The team perceived less than adequate coordination with other agencies and concerned interest groups in planning and carrying out the work. The U. S. Forest Service, the State Fish and Game agency, and, in fact, the SCS biologists seem to be consulted in only a peripheral way. The emergency activity is primarily an engineering function carried out with a minimum of interdisciplinary input.

(d) Construction plans for cleanout of the four rivers above the Corps' reservoirs are being developed by the state design unit without consultation or review by the South TSC, even though the proposed work exceeds the state design approval authority. Although major works of improvement should not usually be proposed in the emergency program, when it is necessary, it should be done in accordance with sound engineering procedures and in accordance with usual review and approval procedures.

Peter Forsythe, SCS engineer, testified at trial that, following the 1973 flood, fifty Mississippi counties were declared as disaster areas, and SCS secured an initial appropriation exceeding $8,000,000 for emergency assistance. Because of the diversity of the many watershed problems presented to his office, Forsythe relied chiefly upon his field staff to accumulate data from which he and Hayward made their revised evaluation. The only specific data which Forsythe obtained was rainfall and sedimentation information from Andrew J. Bowie, Research Hydrologist at the Sedimentation Laboratory, whose data was accumulated from Pidgeon Roost Creek. Bowie collected no data of sedimentation, rainfall, or of other sort from the Tippah River, although he was of the opinion that there was similarity between topography, land use, and rainfall conditions in 1973 between Pidgeon Roost Creek and Tippah Creek. Forsythe, armed with this information and relying upon the March 1976 cross section survey at 1000 foot intervals, felt that he had adequate information at hand to testify, that the Tippah River project and various other projects throughout the State of Mississippi should be scheduled for emergency assistance under § 216, particularly since the Tippah River project was to be a joint undertaking between SCS and the Corps, and the Corps could be counted upon to make an adequate assessment of all pertinent environmental factors. Forsythe, as well as other witnesses placed on the stand by defendants, emphasized that, even though they intended to let the contract work, they would provide a monitoring program to determine the effect of the excavation downstream upon Sardis Lake, the water quality of Sardis Lake, and any other identifiable, significant adverse effects resulting from the excavation, and stop the work in case of such consequences. Chester Bellard, State Soil Conservationist since January 1, 1977, testified that this monitoring program would be the joint effort of SCS and the Corps, which would take place throughout the period of construction and for such reasonable period of time thereafter as to ascertain the significant impact of the project and to identify any adverse effects. Bellard was, himself, without any personal knowledge of the ongoing problems which had been encountered with Tippah River since the original 1966 excavation and was not in position to give testimony as to the amount of sedimentation which had accumulated prior to 1973 or thereafter. When pressed for an opinion as to what was SCS's position in this case, he stated that the buildup which obstructed the flow as a "combination" of both gradual accumulation and sudden flooding. This opinion, however, has no support in the extensive, documentary evidence which the court finds more persuasive. The testimony of landowners, including Commissioner Davis, must likewise be viewed as insubstantial in

light of Davis' emphatic complaints about major sedimentation buildup before 1973.

█ We therefore find, as a fact, from the overwhelming evidence there was no "sudden impairment" within the meaning of § 216 caused by flooding or other natural force which would justify expenditure of § 216 funds as an emergency measure for run-off retardation and to prevent soil erosion for the protection of lives and property. Indeed, since it is manifestly clear there was no *sudden impairment*, it is unnecessary to critically examine the evidence as to whether an *emergency existed* because of 1973 flooding, or whether, if it did exist, such measures were required to *safeguard lives and property*. The question is not whether the Corps correctly followed the environmental procedures prescribed for emergency assistance by § 216 of the Flood Control Act of 1950. We do not fault the procedural aspects of an environmental assessment conducted by the District Engineer for a project which is legitimately authorized by § 216. The fatal flaw in this case is that the evidence wholly fails to show that the Tippah River project falls within the criteria prescribed by § 216, or qualifies as a § 216 project for emergency assistance. We thus hold that the agency decision for the SCS and the Corps to proceed thereunder was legally incorrect for it was inconsistent with the applicable law governing the expenditure of § 216 funds. Specifically, the agency action contravened § 706(2)(A) of APA as "arbitrary," an "abuse of discretion," and "inconsistent with law," and also § 706(2)(C) as "short of statutory right."

## II. APPLICABILITY OF NEPA

We next address the question of whether the procedural requirements of NEPA apply to the Tippah channel improvement in-

sofar as expenditure of federal funds is involved and mandate compliance therewith, including the preparation of a detailed EIS. Admittedly, no such EIS, within the meaning of NEPA, was prepared by either SCS or the Corps.

By enactment of NEPA on January 1, 1970, the Congress required procedural compliance with NEPA on all "major Federal actions significantly affecting the quality of the human environment" by taking specific steps outlined in 42 U.S.C. § 4332, including the preparation of a detailed environmental impact statement on this project by the responsible official on five aspects precisely enumerated in that statute.[1] The crux of this portion of the case is whether, from the standpoint of expenditure of federal funds—quite apart from the use of § 216 funds—the Tippah River cleanout may be denominated as a major federal action significantly affecting the quality of the human environment.

█ When a federal action of the above character is proposed, courts must scrutinize the decision of the responsible office to determine if there has been compliance with NEPA's procedural requirements; we are, however, admonished to refrain from substituting our judgment for that of the responsible agency as to the substantive merits of the environmental consequences of proceeding with the proposed action. The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976). See also *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* —— U.S.

---

1. § 4332(C):

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

——, ——, 98 S.Ct. 1197, 55 L.Ed. 460 (1978).[2]

In the case sub judice, the proposed action is completely federal in that it involves the expenditure of more than $800,000 federal money, and not a dime of state or local revenue; it has been the subject of study and planning by SCS and the Corps prior to the 1973 flood, and has been the subject of active proposals and revisions thereof since 1975. We recognize that not every federal action requires NEPA compliance; it must be *major*, and its effect on the *quality of human environment* must be *significant*. Necessarily, such criteria eliminate actions which are minor or unimportant and for which there is no sensible reason for the making of an EIS; such a statement, however, is absolutely required where the proposed action may fairly be said to have a potentially significant adverse effect. *Hanly v. Kleindienst*, 471 F.2d 823, 831 (2 Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974. Thus, where the action has so little effect upon the quality of human environment to be insignificant, a § 102 EIS is not required. *Hanly v. Mitchell*, 460 F.2d 640 (2 Cir. 1972), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256. Moreover, the Fifth Circuit has adopted these same standards in *Save Our 10 Acres v. Kreger*, 472 F.2d 463 (5 Cir. 1973):

> If the court concludes that no environmental factor would be significantly degraded by the project, [the] determination not to file the impact statement should be upheld. On the other hand, if the court finds that the project may cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant [plaintiff] such other equitable relief as it deems appropriate.

[472 F.2d at 467.]

In ascertaining the significance of a major federal action, the project must be assessed with a view to the overall, cumulative impact of the action proposed, related federal action and projects in the area and further actions contemplated. *City of Rochester v. U. S. Postal Service*, 541 F.2d 967, 972 (2 Cir. 1976); 40 CFR § 1500.6(a) (1975). It is no defense to noncompliance with NEPA that the proposed project may be, or become, significant in long-range character only if it involves repetitive actions, for considerations of environmental factors "to the fullest extent possible," and "beginning at the earliest possible point" are necessary. 38 Fed.Reg. 10856, 19865 (1973). As recognized by the Second Circuit, in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 936 (2 Cir. 1974), Congress was quite aware that incremental effects of small, but repetitive, projects could have major long-term effects.[3]

The record is replete with substantial evidence that the proposed excavation in the Tippah River is, undeniably, a major federal action which significantly affects, or has the potential for significantly affecting, the quality of human environment. At the very threshold of this case is the fact that nearby is the Sardis Reservoir, a major federal construction, which, like its sister

**2.** This restricted role that courts should play in abstaining from reviewing the substantive merits of a NEPA undertaking vindicates the position originally taken by this court in *Environmental Defense Fund, Inc. v. Corp. of Engineers*, 348 F.Supp. 916 (N.D.Miss.1972) (Tennessee-Tombigbee Waterway), *aff'd* 492 F.2d 1123 (5 Cir. 1974).

**3.** Footnote 37 of this case discloses an important aspect of NEPA's legislative history in these words:

> The Senate report accompanying NEPA states expressly that one function of the Act is to prevent decisionmaking that affects the environment to take place "in small but steady increments which perpetuate rather than avoid the recognized mistake of previous decades." S.Rep.No.91–296, 91st Cong., 1st Sess. 5 (1969).

reservoirs, Arkabutla, Grenada and Enid, was designed primarily for flood control of the low lands to the south, has nevertheless, through the expenditure of vast amounts of federal revenues, become a major recreational area used by millions of people annually. For example, the evidence shows that Sardis Lake, 70 miles from Memphis, had more than two million visitors in 1976, who enjoyed boating, camping and optimum fishing conditions in Sardis' clear waters. It is significant that the Arkabutla Reservoir, no more than 40 miles from Memphis, was bypassed because of the turbidity of its waters, and consequent poor fishing conditions brought about by SCS–Corps channelization of the Coldwater-Pidgeon Roost subwatershed. Parelleling Arkabutla's experience, according to the uncontradicted evidence, the dredging during 1967–70 of Skuna River, caused Grenada Lake to stay muddy for several years thereafter, with the actual fish catch dropping off 80 to 90%. The original excavation of Tippah River in 1965–66 had a significant impact, not only upon Tippah River itself, but also upon Sardis Lake. Studies by the Mississippi Game & Fish Commission reveal that as a result of increased turbidity from the Tippah enlargement, muddy water conditions persisted for three years thereafter. Although the effect of increased turbidity did not materially decrease the average number of fish caught per hour, the unattractive appearance of the water had significant influence upon the willingness of citizens to fish therein. For instance, 1966–67 and 1967–68 data indicate a drop of 12,000 fishermen from the average number of the eight preceding years, and 18,300 lower than the average two preceding years. Sardis' fishing did not regain normalcy until 1972 according to the State Game and Fish Commission. It was the position of both state and federal fishery officials that, in their judgment, damage to fishing at both Sardis Lake and Tippah River would inevitably result from the proposed cleanout of Tippah River. As for the Tippah River, the Corps recognized that following the original channelization in 1967, the pounds of fish per acre fell drastically, from 240 pounds with a great diversity of species, to 5 pounds (Pltf. Ex. 1, p. 3). According to Mississippi State Game and Fish studies, "[i]n 1968, after the channelization had been completed in Tippah River, the fish population had dropped to 4.8 pounds per acre with little diversity. Since this time, there has been some increase in the poundage per acre until 1975, when it had reached 34.2 pounds per acre. If this area is cleaned out, this poundage will probably drop again to near or below the level of 1968." (Pltf. Ex. 14, Ex. M. Letter from Joe Stone, Director of Conservation to the District Engineer dated March 25, 1977).

The preparation of a § 102 statement for the Tippah River project was recommended to the District Engineer by the following fishery and wildlife specialists: B. J. Woods, Chief, Recreational Resource Management Branch, U. S. Corps of Engineers (Pltf. Ex. 2, report dated October 5, 1977, and Ex. 3, report dated December 17, 1977); Mississippi Game & Fish Commission; Mississippi Chapter of American Fisheries Society (Pltf. Ex. 14, Ex. 5). Moreover, despite the District Engineer's efforts to weigh the pros and cons of the environmental factors of this project, it is clear that Corps personnel entertained very serious doubts about the environmental consequences of this proposal, for Col. Moellering, the District Engineer, in his finding of October 28, 1977 (Pltf. Ex. 1), concluded:

Although the specific effects of this project have not been quantified, the cumulative effects of numerous such projects could result in serious environmental detriments. The long-term effects of this project on the Tippah River, Tallahatchie River, and Sardis Lake ecosystem are not known. The environmental monitoring plan will provide valuable data on the effects of this project as well as other projects of this nature. This data can be used to base decision on similar projects in the future.

Similarly, subordinate Corps personnel viewed the project with no small amount of trepidation. According to reports from James A. Arnold, Water Quality Specialist (Pltf. Ex. 4), Mike Dawson, U. S. Wildlife Biologist (Pltf. Ex. 17), Robert P. Flanagan, Leon G. Colborn, Corps Field Supervisor (Pltf. Ex. 18),[4] the project was fraught with potential environmental hazards.

It is evident that the monitoring program, which was visualized for the Tippah River project by the Corps and SCS, was made necessary by their lack of in-depth knowledge as to the significant effects of the proposed action on the quality of human environment in relation to not only Tippah River, but also Sardis Reservoir. Indeed, notwithstanding the awarding of contracts and doing of the work, these agencies proposed to stop the work at any point adverse effects became identifiable. This, in our minds, is a virtual confession that the channelization of Tippah River was being projected without the responsible federal officials knowing the pluses and minuses of the pertinent environmental factors and potential for long-range significant effects on the amenities of the human environment. It was precisely to avoid damage done from carrying out partially, or ill-considered plans of improvement that Congress adopted the searching procedures prescribed by NEPA for an in-depth, interdisciplinary analysis of all environmental factors so that at the time of ultimate decisionmaking, the responsible officials would know whether they should proceed with the federal action.

### III. PREREQUISITES FOR PRELIMINARY INJUNCTIVE RELIEF

We are mindful of the fact that the case is before the court on a motion for preliminary injunction, the parties having been unwilling to agree to advance the trial on the merits under Rule 65(a)(2), F.R. Civ.P. Consequently, plaintiffs bear the burden, as they properly should, of showing the well-known prerequisites for obtaining the extraordinary relief of preliminary injunction, as follows:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5 Cir. 1974). These prerequisites have not been altered in a NEPA case, where suit has been grounded on the failure to file an impact statement.

In many cases, preliminary injunctions have been granted, but only because the plaintiff, by showing no statement had been filed, had demonstrated a probability of success on the merits, and had further met the other usual requirements.

Id. at 578. In the case sub judice, plaintiffs have demonstrated on the evidence adduced that there is a substantial likelihood that they will prevail on the merits, that plaintiffs will suffer irreparable injury if the preliminary injunction is not granted, that the threatened injury to the plaintiffs and the public at large outweigh the threatened harm the injury may do to the defendants, and that granting the preliminary injunction will not disserve, but will enhance, the public interest.

Accordingly, let a preliminary injunction issue.

**4.** "Bottom line comment—in reality this is a local push w/SCS and CE support to get channel maintenance work done w/Federal funds and the SCS Emergency Flood Control Act."