Henry Beetle HOUGH, et al., Plaintiffs,

v.

John O. MARSH, Jr., as he is Secretary of the Army, et al., Defendants.

Civ. A. No. 81–1822–N.

United States District Court,
D. Massachusetts.

Nov. 19, 1982.

Thomas B. Bracken, Bracken & Baram, Boston, Mass., for plaintiffs.

Asst. U.S. Atty., Nancy Serventi, Boston, Mass., for defendants Marsh and Edgar.

Stanley H. Rudman, Guterman, Horvitz, Rubin & Rudman, Boston, Mass., for defendants Harbor View, Carroll and Jones.

Richard McCarron, Town Counsel, Edgartown, Mass., for defendant Anderson.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

This case involves an attempt by two individuals, defendants Carroll and Jones, to construct for their private use two residences and a tennis court on a three-acre tract of land abutting Edgartown Harbor on Martha's Vineyard. A necessary step in this undertaking is the deposit of 6500 cubic yards of landfill on approximately one-quarter acre of wetlands—an action requiring approval by the Army Corps of Engineers (the Corps) under section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344. At issue here is the propriety of the Corps' decision granting a permit for such fill. The plaintiffs, ten residents of Edgartown, allege that the Corps' action contravenes the provisions of, and regulations accompanying, three federal statutes—the CWA, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq.—along with those of certain state and local laws. The defendants, who in addition to the private developers include the Secretary of the Army, the Corps engineer who issued the § 404 permit here and the Edgartown building inspector, contend that all statutory directives have been satisfied. Both sides have moved for summary judgment.

*Background*

The following facts are undisputed. The parcel of land in question is in a scenic area known as "Starbuck's Neck," between North Water Street and the harbor shoreline. Directly across the street is the Harbor View Hotel, also owned by defendants Carroll and Jones. The parcel is separated from the harbor and a connecting saltwater pond only by a narrow barrier beach and a gravel roadway curving out to the Edgartown lighthouse some 270 yards away.

In May 1976, the private defendants commenced the arduous task of obtaining all necessary governmental authorizations by applying to the Edgartown Board of Selectmen for building permits. These permits were signed but remained undelivered pending compliance with other local requirements. Second, the defendants applied to the Edgartown Planning Board for endorsement of a plan subdividing the project site into two lots. Construing the application as a proposed "Development of Regional Impact" under Mass.St.1974, c. 637, the Planning Board referred it to the Martha's Vineyard Commission (MVC), a regional commission created to ensure that "land usages" do not "unduly" impair the "unique natural, historical, ecological, scientific and cultural values of Martha's Vineyard." *Id.* § 1. Following a public hearing, the MVC on September 16, 1976, disapproved of the proposed subdivision, stating that the plan would "be detrimental to the public welfare," that it would "cause irreversible environmental damage," and that "no benefits [existed] to offset these detrimental impacts." Although the defendants never appealed this ruling, the residents of Edgartown subsequently voted, in a referendum on April 13, 1978, and pursuant to Mass.St.1977, c. 836, to withdraw from the MVC. Third, on December 2, 1976, the defendants provided the Edgartown Con-

servation Commission with notice of its project as required by the Wetlands Protection Act, Mass.G.L. c. 131, § 40. Following two preliminary stages of administrative hearings examining the propriety of the proposed fill and construction, an adjudicatory hearing was held before the Massachusetts Department of Environmental Quality Engineering (DEQE). On December 20, 1979, the DEQE Commissioner ruled that the contemplated development would impinge upon none of the environmental concerns embraced by the Wetlands Protection Act and thus could proceed without condition.

As the local regulatory processes were winding down, the federal process commenced. Immediately following the DEQE decision, the private defendants, apparently unaware of the applicability of the Clean Water Act,[1] initiated filling operations. Upon receipt of a cease and desist order from the Corps, they applied under section 404 of the CWA for approval to retain the fill unlawfully discharged and to deposit additional fill on the site. The Corps disseminated public notice of the permit application and, in response to its invitation for public comment, received 259 written objections to the project, including a petition bearing over 200 signatures and letters from the Vineyard Open Land Foundation and the 1000-member Vineyard Conservation Society, Inc. A single letter was received in support of the project. The views of three interested federal agencies, also solicited by the Corps, were less one-sided. The Environmental Protection Agency urged that the permit be issued, concluding that the development would have insignificant effects on marine fisheries, shell fisheries, waterfowl and wildlife and would cause no "permanent unacceptable disrup-

tion to the aquatic ecosystem of the salt pond or Edgartown Harbor." The National Marine Fisheries Service and the Fish and Wildlife Service, by contrast, recommended denial of the permit. The former, while acknowledging the parcel to be "of marginal value to fishery resources," cited the loss of "nutrients and habitat to the surrounding ecosystem." The latter characterized the area as a "valuable" habitat for wildlife, a "storage area for storm and flood water," and a "buffer zone acting to filter and trap runoff and pollutants."

Armed with these sundry submissions, the transcript of the DEQE hearing and its own field reports, the Corps determined that a public hearing on the section 404 permit application was unnecessary for an informed agency decision. That decision was announced on May 6, 1981, in favor of the applicants. In his Findings of Fact and an accompanying Environmental Assessment,[2] the Division Engineer—after canvassing an array of environmental, aesthetic, economic, historic and other considerations—concluded that the applicants' "right to reasonable use of [their] property for reasonable residential purposes" overrode the minimal impact of the development on these values and that it was therefore "in the public interest to issue this permit." The plaintiffs now seek to overturn the Corps' determination for its alleged failure to have considered sufficiently, or at all, several factors highly germane to the section 404 inquiry.

*Jurisdiction and Cause of Action*

Plaintiffs seek review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06. Except when a statute specifically precludes judicial review or when agency action is committed to agency dis-

1. Although the Corps, upon first learning of the defendants' project in July 1978, sent a letter to Carroll advising him of the agency's likely jurisdiction, the defendants deny ever receiving it. In deciding not to initiate legal action for the unauthorized filling that occurred in December 1979, the Corps acknowledged that there was "no evidence that [defendants] ever received our original letter."

2. In the Environmental Assessment, the Corps confirmed its earlier "preliminary determination" that its decision on the permit application would not constitute a "major Federal action significantly affecting the quality of the human environment" and thus that preparation of an environmental impact statement would not be required under 42 U.S.C. § 4332(2)(c). Plaintiffs have lodged no objection to this determination.

cretion by law, *id.* § 701(a), the APA authorizes review of all "final agency action for which there is no other adequate remedy in a court," *id.* § 704, at the behest of any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* § 702. It is now settled that, although the APA provides no independent source of subject-matter jurisdiction, *Califano v. Sanders,* 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–985, 51 L.Ed.2d 192 (1977), APA review can properly rest on the grant of federal-question jurisdiction in 28 U.S.C. § 1331(a). *E.g., id.* at 105, 97 S.Ct. at 984; *CETA Workers' Org. Comm. v. New York,* 617 F.2d 926, 935 (2d Cir.1980). The defendants contend, however, that APA review of Corps decisions under the Clean Water Act is unavailable because an "adequate remedy" already exists. They point to the citizen-suit provision in section 505, 33 U.S.C. § 1365, which authorizes private actions against (1) any person alleged to be in violation of an "effluent standard or limitation under this chapter" or of an EPA or state order "with respect to such a standard or limitation," and (2) the EPA Administrator for failure to perform "any act or duty under this chapter which is not discretionary." *Id.* § 1365(a). Relying on *Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1980), in which the Court rejected the suggestion that the CWA authorized by implication additional private rights of action, the defendants argue that section 505 provided plaintiffs with their only available remedy. As plaintiffs admittedly have failed to comply with the notice requirement prescribed by section 505(b), it is contended that the action must be dismissed.

■ This argument misconstrues the CWA's enforcement mechanism. Section 505 by its express language is inapplicable to the present suit, even if it otherwise encompasses the section 404 permit process. Plaintiffs are not seeking to enjoin private conduct allegedly violative of the statute, nor to compel an agency official to perform a nondiscretionary duty. Quite to the contrary, they are alleging an abuse of discretion in the issuance of a permit. That such an administratively-oriented complaint differs from those contemplated by the citizen-suit provision is suggested by section 509, which states that review of specified actions of the EPA Administrator—including the issuance or denial of a National Pollutant Discharge Elimination System permit under 33 U.S.C. § 1342—may be had at the Court of Appeals level. *Id.* § 1369(b)(1). This provision makes no reference to section 404 permits. However, contrary to the alternative implication in defendants' argument, it is apparent that nothing in the CWA was intended to foreclose judicial review of the section 404 process at the behest of an interested, private party. First, even if the Corps' decisions in this context could be considered "actions" of the EPA Administrator within the meaning of section 509, the lack of reference there to section 404 permits is of no import: "The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *e.g., State of Washington v. EPA,* 573 F.2d 583, 587–88 (9th Cir.1978) (the designation of "a specific mode of judicial review for those actions of the Administrator enumerated in § 509(b)(1) of the Act does not alone suffice to preclude an alternative form of judicial review of final administrative action not encompassed [therein]"). More important, the citizen-suit provision contains a saving clause which states in part: "Nothing in this section shall restrict any right which any person ... may have under any statute ... to seek any other relief ...." 33 U.S.C. § 1365(e). The Court in *Middlesex* held that, notwithstanding this provision, the CWA conferred no private right of action for damages stemming from alleged statutory violations, remarking: "It is doubtful that the phrase 'any statute' includes the very statute in which this statement was contained." 453 U.S. at 15–16, 101 S.Ct. at 2624 (footnote omitted). The

plaintiffs here, however, base their cause of action not on the CWA itself but on the APA. Defendants' reliance on the *Middlesex* case is thus misplaced.

For the foregoing reasons, the court concludes that, pursuant to 28 U.S.C. § 1331(a) and the APA, the plaintiffs may seek review of the Corps' decision to grant a section 404 permit. *See, e.g., Hart & Miller Islands Area Envir. Group, Inc. v. Corps of Engineers,* 505 F.Supp. 732, 735 n. 1 (D.Md. 1980); *Sierra Club v. Alexander,* 484 F.Supp. 455, 459–64 (N.D.N.Y.), *aff'd mem.,* 633 F.2d 206 (2d Cir.1980); *Sierra Club v. Bergland,* 451 F.Supp. 120, 123 (N.D.Miss. 1978); *see also Boles v. Onton Dock, Inc.,* 659 F.2d 74 (6th Cir.1981); *Action for Rational Transit v. West Side Highway Project,* 536 F.Supp. 1225 (S.D.N.Y.1982). The applicable scope of review calls for a determination of whether the Corps' action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

*Requirement for a Public Hearing*

Preliminarily, the plaintiffs contend that the Corps' failure to conduct a public hearing constituted an abuse of discretion under the CWA and accompanying regulations. The statute contains only an oblique reference to this issue, stating that the Secretary of the Army, acting through the Chief of Engineers, may issue permits "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a). The Corps' implementing regulations, however, provide greater detail:

[A]ny person may request, in writing, . . . that a public hearing be held . . . . Upon receipt of any such request, stating with particularity the reasons for holding a public hearing, the District Engineer shall promptly set a time and place for the public hearing . . . . Requests for a public hearing under this paragraph shall be granted, unless the District Engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing.

33 C.F.R. § 327.4(b). Of the 259 letters received by the Corps in opposition to the permit application, eight requested a hearing. Five of these proffered no reasons, and in two others the authors simply expressed a belief that other persons might wish to be heard. The eighth letter, however, written by an attorney on behalf of plaintiff Mary Wakeman, did attempt to justify the request, contending that a hearing was necessary for thorough evaluation of the Corps' section 404 criteria, the project's impact on the public view of the Edgartown lighthouse and the relevance of local land use and planning schemes. In subsequently rejecting these requests, the Corps stated that a hearing would contribute no "new information of value" to the already "substantial administrative record" and would otherwise serve no "valid interest." It added that the record would remain open for additional written comments until final action was taken.

■ There is no dispute concerning the validity of the Corps regulations; the Supreme Court has recently upheld EPA regulations under section 402 of the CWA that similarly condition the right to a hearing on an applicant's ability "to meet a threshold burden of tendering evidence suggesting the need for a hearing." *Costle v. Pacific Legal Foundation,* 445 U.S. 198, 214, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980); *accord, Georgia-Pacific Corp. v. EPA,* 671 F.2d 1235, 1241 (9th Cir.1982). But unlike the petitioning party in *Costle,* whose request "raised legal, rather than factual, issues," 445 U.S. at 219–20, 100 S.Ct. at 1107–1108, plaintiff Wakeman arguably has satisfied this threshold burden here. Although her references to the permit criteria and local land use plans might be disregarded as insufficiently concrete, her expressed concern for preserving a view of the lighthouse seemingly raised a specific factual issue. More generally, the Corps' determination that a hearing would serve no "valid interest" is not entirely convincing under the circumstances. That the project was controversial had been evidenced, not only by the considerable public opposition, but by

the opinions of two federal agencies recommending rejection of the permit application. And although the state DEQE had earlier conducted a full-scale adjudicatory hearing, the transcript of which had been included in the administrative record, even the Corps recognized that such was of limited applicability. The Chief of the Corps' Enforcement Section reported:

> [T]he DEQE review is limited by Mass. law to only a few issues and is not as broad as our review. A great deal of available evidence was not admitted at the State hearing because it was not relevant to those limited issues. Much of the omitted evidence, however, would be relevant to our permit decision.[3]

It is also worth noting that "the legislative history of the [CWA] indicates a strong congressional desire that the public have input in decisions concerning the elimination of water pollution," *Costle v. Pacific Legal Foundation*, 445 U.S. at 215, 100 S.Ct. at 1105, and that "an opportunity to submit documents [does not] constitute . . . a public hearing." *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872, 879 (1st Cir.) (footnote omitted), *cert. denied*, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978).

To be sure, these several factors, particularly when balanced against the agency's considerable discretion in this area and the need for streamlined administration of permit programs, do not free the issue of all doubt. Yet this court need not decide whether the Corps' refusal to conduct a hearing would by itself necessitate reversal. Since, as explained below, a remand is otherwise necessary, it suffices to conclude that a public hearing should be conducted in conjunction with these further proceedings.

*The Clean Water Act Criteria*

The Clean Water Act, for all its myriad provisions, offers little guidance in the present inquiry; all of the governing criteria appear in agency regulations. The statute's general mandate is contained in section 301: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Section 404 states in part: "The Secretary [of the Army] may issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a).[4] It also provides that the consideration of permit applications shall occur "through the application of guidelines developed by the Administrator

---

**3.** The Wetlands Protection Act requires an examination of whether the affected area "is significant to public or private water supply, to the ground water supply, to flood control, to storm damage prevention, to prevention of pollution, to protection of land containing shellfish, or to the protection of fisheries." Mass. G.L. c. 131, § 40, par. 12. An indication of the more expansive scope of the CWA inquiry, to be described more fully below, is provided by the concluding comment in the Division Engineer's Findings of Fact:

> I have considered all factors affecting the public interest including conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage protection, land use classifications, navigation, recreation, water supply, water quality, public safety, energy needs, food production, and in general, the needs and welfare of the people.

**4.** Although the private defendants raised a question at the administrative level as to the Corps' jurisdiction over their project, they advance no such challenge in this court. The statute's applicability appears clear. The term "pollutant" includes "rock" and "sand." 33 U.S.C. § 1362(6). The term "navigable waters" means "the waters of the United States, including the territorial seas." *Id.* § 1362(7). The term "waters of the United States" includes "adjacent wetlands." 33 C.F.R. § 323.2(a)(4). The term "wetlands" means "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." *Id.* § 323.2(c). Finally, the term "adjacent" means "bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.' " *Id.* § 323.2(d). These definitions that appear in the Corps' regulations are mirrored in the revised EPA guidelines, 40 C.F.R. § 230.3(b), (s)(7), (t)—which expressly apply to all 404 permit decisions made after March 30, 1981.

[of EPA], in conjunction with the Secretary [of the Army]," *id.* § 404(b), "acting through the Chief of Engineers." *Id.* § 404(d).[5]

The section 404 permit process is governed simultaneously by Corps regulations, 33 C.F.R. Parts 320–29, and by EPA guidelines, 40 C.F.R. Part 230. Both sets of rules must be observed. *See* 33 C.F.R. § 323.-5(a); 40 C.F.R. § 230.2(a). The Corps regulations prescribe twelve "general policies" for evaluating permit applications, five of which are here relevant. Four of these pertain to all permit applications. First, the Corps must conduct a "public interest review," balancing the "benefit which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a). This provision recites a non-exhaustive list of some sixteen factors—quoted by the Division Engineer, *see* note 3 *supra*—that are germane to this inquiry, and then declares: "No permit will be granted unless its issuance is found to be in the public interest." 33 C.F.R. § 320.4(a). Second, the Corps is instructed to consult with the Fish and Wildlife Service and the National Marine Fisheries Service and to accord "great weight" to their views on "fish and wildlife considerations." *Id.* § 320.4(c). A third provision mandates that "due consideration" be given to the proposal's effect on the "enhancement, preservation, or development" of "historic, cultural, scenic, conservation, recreational or similar values." *Id.* § 320.4(e)(1). "Particular attention," moreover, "should be directed toward any . . . building, structure, or object listed or eligible for listing in the National Register of Historic Places." *Id.* § 320.4(e)(2)(ii). Fourth, the Division Engineer must inquire into other federal, state, or local requirements: "Permits will not be issued where certification or authorization of the pro-

posed work is required by Federal, State and/or local law and that certification or authorization has been denied." *Id.* § 320.-4(j)(6).

The final Corps "policy" pertains specifically to wetlands. It declares that wetlands "are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."[6] *Id.* § 320.4(b)(1). This provision then identifies seven types of functions performed by wetlands that are "important to the public interest," *id.* § 320.4(b)(2), and states that "[n]o permit will be granted to work in wetlands identified as important" under any of these criteria unless the Corps makes the following two findings: (1) that, under the public interest review analysis, "the benefits of the proposed alteration outweigh the damage to the wetlands resource," and (2) that "the proposed alteration is necessary to realize those benefits." *Id.* § 320.4(b)(4). In making this latter determination, the District Engineer "shall consider whether the proposed activity is primarily dependent on being located in, or in close proximity to, the aquatic environment and whether feasible alternative sites are available." *Id.* The applicant has the burden of providing information as to the project's water-dependency and also data "on the basis of which the availability of feasible alternative sites can be evaluated." *Id.*

The pertinent EPA guidelines can be described more briefly. At the outset, they announce a general presumption against discharge:

> Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an

---

**5.** The only statutory guidance for the issuance of such guidelines consists of the directive in section 1344(b) that they "shall be based upon criteria comparable to the criteria applicable to the territorial seas" specified in section 1343(c). This latter provision requires EPA consideration of the effect of disposal of pollutants on, *inter alia,* human health and welfare, marine

life, and aesthetic, recreational and economic values.

**6.** This sentiment is echoed elsewhere in the Corps regulations: "[T]o the maximum extent practicable, . . . [d]ischarges in wetlands areas should be avoided." 33 C.F.R. § 323.4(b)(5).

unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern. 40 C.F.R. § 230.1(c).[7] The guidelines parallel the Corps regulations in deeming wetlands worthy of special protection. Wetlands are included in the category of "special aquatic sites," defined as "geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values." *Id.* § 230.3(q–1). With respect to such sites, the guidelines state:

> From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

*Id.* § 230.1(d). Such heightened solicitude for wetlands is specifically manifested in the treatment of alternatives. For all proposed projects, the guidelines prohibit issuance of a permit if there is a "practicable

alternative"—defined as one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes"—that would have "less adverse impact on the aquatic ecosystem." *Id.* § 230.-10(a). With respect to wetlands and other "special" sites, however, "[w]here the activity associated with a discharge which is proposed . . . does not require access or proximity to or siting within the special aquatic site (i.e., is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3). Thus, the guidelines couple a general presumption against all discharges into aquatic ecosystems with a specific presumption that practicable alternatives to the fill of wetlands exist.

The District Engineer found that the private defendants had successfully shouldered the formidable evidentiary burden imposed by this regulatory scheme.[8] He determined first that the wetland in question performed functions that satisfied—barely—one of the seven indicia of "importance" in 33 C.F.R. § 320.4(b)(2),[9] thereby triggering

7. This provision's reference to cumulative impact is repeated elsewhere. The EPA guidelines require a "permitting authority" to collect, document and consider information "about the cumulative impacts on the aquatic ecosystem." 40 C.F.R. § 230.11(g)(2). The Corps regulations similarly require the Division Engineer, in conducting the public interest review, to consider the "probable impact of each proposal in relation to the cumulative effect created by other existing and anticipated structures or work in the general area." 33 C.F.R. § 320.4(a)(2)(iv).

8. Although the Engineer apparently appreciated that the defendants bore the burden of justifying the grant of a permit, one of his comments raises a question in this regard. He remarked: "The general policy of the Corps is that in the absence of overriding national factors of the public interest a permit will generally be issued." This statement derives from, but only partially reproduces, the following provision in the Corps regulation addressing other federal, state and local requirements:

> In the absence of overriding national factors of the public interest that may be revealed during the processing of the permit application, a permit will generally be issued

following receipt of a favorable State determination *provided the concerns, policies, goals, and requirements as expressed in 33 CFR Parts 320 through 324 [and related federal statutes] have been followed and considered.*

33 C.F.R. § 320.4(j)(4) (emphasis added). The underscored language indicates that this provision in no way alters the presumptions and burden of proof delineated elsewhere in the regulations.

9. The criterion deemed relevant refers to wetlands "which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species." 33 C.F.R. § 320.4(b)(2)(i). In his Findings of Fact and accompanying Environmental Assessment, which incorporated a written report of a Corps biologist, the Engineer found that the wetland provided a feeding area for ducks and marsh birds and a general habitat for small mammals, although the latter function was "not considered important" given the wetland's "small" size. The lack of surface water connection with the adjacent marsh and salt pond was held to minimize any contribution of detrital matter to the estuarine ecosystem.

the two-pronged requirement of "net benefit" and "necessity" delineated in section 320.4(b)(4). Regarding the former component, he concluded that the likely benefits— particularly an expanded tax base, additional jobs and the owners' "right to reasonable use" of their property—outweighed the "insignificant loss of wetland." And with respect to the latter, he determined that the project, although not "water-dependent," was nonetheless necessary because of the absence of feasible alternatives. This last finding hinged on a certified statement of an Edgartown real estate broker, dated February 22, 1980 and submitted by the defendants, that "the only lot available in the prime residential and central area of Edgartown" was a parcel "measuring 120 × 215 feet and having a selling price of $90,000.00." The Engineer agreed this site was impractical because it would not "fulfill the basic purpose" of providing two homes and a tennis court and because acquiring it would subject the defendants to "extraordinary expense." Turning to the "public interest review," he determined that the project's impact, both singly and cumulatively, on wildlife, aesthetic, economic and the other specified concerns was insufficient to override the anticipated benefits. Finally, the Engineer concluded that the development would not unduly impinge on historic and scenic values and that all requisite state and local authorizations had been met.

This court's function in reviewing the Corps' decision is not to "substitute its judgment for that of the agency" but rather to ascertain "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *accord, e.g., Strycker's Bay Neighborhood*

*Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam); *Roosevelt Campobello Int'l Park Comm'n v. EPA,* 684 F.2d 1041, 1045 (1st Cir.1982); *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1071–72 (1st Cir.1980). The plaintiffs initially assert that the Corps "could not find" that the public benefit stemming from the construction of two private dwellings outweighed the loss of wetlands and open space and that it was "required to deny the permit without further review." This contention invites precisely the sort of substituted judgment that this court is precluded from exercising. They next maintain that, under the Corps rules, "water dependency" is a prerequisite to the issuance of any permit, the conceded absence of which here compels disapproval of the project. This interpretation misconstrues the applicable regulation. The provision states only that, in evaluating the necessity of any project impinging upon "important" wetlands, the Engineer "shall consider" the water-dependency and feasible-alternative factors. 33 C.F.R. § 320.-4(b)(4). Had mandatory compliance with both criteria been contemplated by the drafters, that intent easily could have been evinced.

■ At the same time, the fact that the project is not water-dependent should necessitate a more persuasive showing than otherwise concerning the lack of alternatives. Indeed, the EPA guidelines specifically require in such a case that an applicant "clearly demonstrate" that practicable alternatives to the proposed fill of wetlands do not exist. 40 C.F.R. § 230.10(a)(3).[10] It is in this regard that the Engineer's determination appears troublesome. The private defendants' entire effort to satisfy this burden consisted, as noted above, of the production of a certified letter from a single

In their written evaluations of the proposal, the National Marine Fisheries Service and the Fish and Wildlife Service attributed greater importance to the wetland, the former opining that it met five of the seven Corps criteria and the latter deeming it valuable not only for food production and habitat but also as a buffer zone and a storm water storage area. The Engineer, however, apparently credited the contrary findings of the Corps biologist.

10. This guideline, of course, further belies plaintiffs' earlier contention that water-dependency constitutes a prerequisite to the issuance of all 404 permits.

realtor written more than fourteen months prior to the Engineer's decision. There was no showing that this letter, citing the availability of only one parcel "in the prime residential and central area of Edgartown," remained an accurate depiction of the local real estate market during these fourteen months. And even if there had been, problems would still persist. No inquiry was conducted into the availability of suitable lots outside this "prime residential" area, and no explanation was offered for limiting the search in such manner. Moreover, although the one reported parcel was too small to support two houses, the private defendants never explained the need to con-

struct their respective dwellings side-by-side. The "exorbitant cost" of that parcel, furthermore, by itself carries little weight; although cost is relevant to an assessment of an alternative's "practicability," [11] the Corps conducted no examination of whether the price was unreasonably high, whether the defendants could afford it, and whether the wetlands parcel could be sold for a comparable or greater amount.[12] Given these unexplored avenues, the court cannot agree that defendants have "clearly demonstrated" that no feasible alternatives to the proposed fill exist.[13]

Plaintiffs advance a separate challenge to the Corps' treatment of the provision in 33

11. The EPA guidelines state:
   An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained ... in order to fulfill the basic purpose of the proposed activity may be considered. 40 C.F.R. § 230.10(a)(2).

12. Plaintiffs have submitted various affidavits in support of their motion, two of which purport to establish that numerous other private residences in Edgartown were for sale during this period and that a local conservation group had offered in July 1981 to purchase the wetland site for $200,000. The defendants object to any consideration of these submissions. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam); accord, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419–20, 91 S.Ct. 814, 825–826, 28 L.Ed.2d 136 (1971); Bradley v. Weinberger, 483 F.2d 410, 414–15 (1st Cir.1973). The Court in Camp indicated that, where an agency's failure to explain its rationale frustrates judicial review, a court's scrutiny of explanatory affidavits is permissible. 411 U.S. at 142–43, 93 S.Ct. at 1244–1245. In addition, it has been held that a court may consider evidence outside the record "to see what the agency may have ignored." County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1384 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). "The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters." Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir.1980). But

consideration of affidavits containing "new rationalizations," Bunker Hill Co. v. EPA, 572 F.2d 1286, 1292 (9th Cir.1977), or otherwise addressing "the propriety of the [agency's] decision itself," Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 286 (D.C.Cir.1981), is beyond the court's proper role.

Under these standards, the affidavit attesting to the availability for sale of other Edgartown residences is arguably admissible. No definitive answer need be offered, however, since the defendants' failure to refute this possibility is the decisive factor. The affidavit from the conservation group pertains to an event occurring subsequent to the Corps' decision and is thus inadmissible. Again, however, it is the defendants' failure to proffer evidence on this issue that is significant.

13. In a separate count of their complaint, plaintiffs allege a violation of section 102(2)(E) of NEPA, which requires all federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This provision—which is not limited to proposed major actions significantly affecting the human environment, the standard triggering the environmental impact statement requirement—requires an agency to undertake "thorough consideration of all appropriate methods of accomplishing the aim of the action." Environmental Defense Fund, Inc. v. Corps of Engineers, 492 F.2d 1123, 1135 (5th Cir.1974); accord, e.g., Aertsen v. Landrieu, 637 F.2d 12, 20 (1st Cir. 1980); Trinity Episcopal School Corp. v. Romney, 523 F.2d 88, 93 (2d Cir.1975). However, since the requirement imposed by the agency regulations is at least coextensive with, if not more demanding than, this analogous NEPA obligation, independent examination of the latter proves unnecessary.

C.F.R. § 320.4(j) addressing "other federal, state, or local requirements." As noted above, this subsection prohibits the issuance of any permit "where certification or authorization of the proposed work is required by Federal, State and/or local law and that certification or authorization has been denied." *Id.* § 320.4(j)(6). The Corps determined that, notwithstanding this provision, the disapproval of the proposed subdivision by the Martha's Vineyard Commission (MVC) did not require denial of the permit since Edgartown subsequently withdrew from the MVC. Plaintiffs now argue to the contrary and point to *McCarthy v. Planning Board of Edgartown,* —— Mass. ——, 1980 Mass.Adv.Sh. 1623, 407 N.E.2d 348, in which the Supreme Judicial Court ruled that an MVC regulation remained in force in Edgartown following its withdrawal. Under the governing statute, the regulation there was to be incorporated into the ordinances and by-laws of each participating municipality and thereafter administered as if it were a part thereof. The Court thus reasoned that the regulation remained in effect following a town's withdrawal, until repealed "by action in the usual manner to amend its zoning by-laws," *id.* —— Mass. at ——, 1980 Mass.Adv.Sh. 1623, 407 N.E.2d 348 at 1626—which action Edgartown had not taken. An examination of the governing statute, Mass.St.1974, c. 637,[14] however, reveals that the *McCarthy* case, despite its factual similarity, is inapposite. Chapter 637 in brief entrusted the MVC with supervision over two distinct concerns: specified geographic areas entitled "districts of critical planning concern," *id.* §§ 9–12, and proposed development projects called "developments of regional impact." *Id.* §§ 13–17.[15] With respect to the former, the MVC was empowered to issue guidelines governing the development of such districts and to ensure that all regulations promulgated by each member town accorded with these guidelines. For any town that failed to adopt such complementary regulations, moreover, the MVC itself could issue regulations "applicable to such municipality's portion of the district" that were to be "incorporated" into its by-laws. *Id.* § 11. An MVC regulation adopted under this provision was at issue in *McCarthy.* The MVC's responsibilities concerning "developments of regional impact" were different; rather than approve or issue regulations, it was empowered to review all applications for requisite permits, licenses, or authorizations submitted to local planning boards and to grant or withhold approval based on specified criteria. *Id.* § 15. The MVC's review of the subdivision application in the present case was pursuant to this latter section. It is therefore apparent that MVC approval of the proposed subdivision was not mandated by any regulation that had been "incorporated" into Edgartown's by-laws, and thus under *McCarthy* remained in effect following the town's withdrawal until repealed, but rather was required by a statutory provision that, upon withdrawal, ceased to apply. Consequently, the MVC's disapproval of the application does not bar issuance of a permit under 33 C.F.R. § 320.4(j)(6).[16]

A problem remains, however. Section 13.2 of Edgartown's zoning by-laws prohibits the filling of any "tidal marsh"—defined in part as any "marsh area in which action of the oceanic tide causes a change in the water level from time to time"—with-

---

14. Although Mass.St.1974, c. 637 was superseded by Mass.St.1977, c. 831, *amended by* Mass.St.1979, c. 319, all provisions pertinent to the present discussion have remained materially intact.

15. In the present case, the MVC determined that the project constituted a "development of regional impact" within a "district of critical planning concern" and thus triggered both concerns.

16. At the same time, the possibility exists that, following Edgartown's withdrawal from the MVC, the developers became obligated to resubmit their application for subdivision approval to the local planning board. Otherwise, the play of events would, rather fortuitously, enable them to avoid this regulatory requirement entirely. Since neither the Corps nor the parties have addressed this issue, however, and since a remand is otherwise necessary, the court will withhold decision on this question pending initial consideration by the Corps.

out a "special permit" form the planning board, which the private defendants have not obtained. Section 13.4 of the by-laws, moreover, imposes a flat ban on filling for the purpose of constructing private residences within any "beach area," defined as that area "extending from the mean low water line to the inland edge of land covered by sand dunes or by beach grass." In addition, the MVC has incorporated these restrictions in a "district of critical planning concern" regulation placing the project site within the "shore zone" of the "coastal district"—a regulation which under *McCarthy* remains in effect until repealed. Since no "certification or authorization has been denied" with respect to these laws, 33 C.F.R. § 320.4(j)(6) is seemingly unimplicated. However, section 320.4(j)(2) states:

> Where officially adopted State, regional, or local land-use classifications, determinations, or policies are applicable to the land or water areas under consideration, they shall be presumed to reflect local factors of the public interest and shall be considered in addition with the other national factors of the public interest identified in § 320.4(a).

The Corps' failure to consider these potentially applicable [17] local requirements necessitates remand on this issue also.

■ To complete the discussion of the Clean Water Act, the court notes two additional factors that the Corps failed to address properly in connection with the public interest review mandated by 33 C.F.R. § 320.4(a). These issues, although not raised by plaintiffs specifically, merit attention since a remand is otherwise necessary. The "public interest" provision includes among the factors that "must be considered" those dealing with "economics" and "cumulative effects." With respect to

the former, the Corps did mention the positive anticipated impact of the proposal on jobs and municipal taxes. But it sidestepped any consideration of adverse economic effects—particularly, in its words, the "elimination of an attraction [the Edgartown lighthouse] on the itinerary of sightseeing buses"—with the comment: "This is a local issue and the proposed use of the land is consistent with local land use regulations." This conclusion, aside from arguably misconstruing the local laws, ignores the directive in the Corps regulations to consider all economic factors. Second, the Corps' finding of no adverse cumulative effects rested upon the observation that "future applications for similar work will be evaluated in light of the public interest on their own merit." This constitutes only half of the requisite inquiry in this regard; the Corps regulations specifically require consideration of the "probable impact of each proposal in relation to the cumulative effect created by other *existing* and anticipated structures or work in the general area." *Id.* § 320.4(a)(2)(iv) (emphasis added). Consequently, remand appears appropriate to enable the Corps to address these issues.

### The National Historic Preservation Act

Plaintiffs' final challenge centers upon the Corps' alleged disregard of the historic values associated with the Edgartown lighthouse, which as noted above lies at the end of a gravel walkway adjacent to the project site. Aside from the reference in his economic-factors evaluation just mentioned, the District Engineer considered the lighthouse only in his assessment of the proposal's impact on scenic and aesthetic values, stating that "[t]he private homes will inter-

17. Plaintiffs have submitted an affidavit from a marine ecologist classifying the project site "as a combination of tidal marsh and beach according to the zoning by-laws of the Town of Edgartown." This affidavit is admissible for the purpose of illuminating relevant factors that the Corps may have ignored. *See* note 12 *supra.* Without necessarily adopting the ecologist's characterization, the court finds his statement sufficient to refute any suggestion that the by-

laws were so obviously inapplicable as to obviate consideration of them by the Corps.

Plaintiffs' present motion for summary judgment does not embrace those counts in its complaint alleging violations of state and local law. The court's reference to these allegations is not intended as a substantive determination of their validity, but rather is included only to demonstrate that the Corps' failure to consider them contravened the federal regulations.

rupt the view of the harbor and the lighthouse from many points on North Water Street but the view will not be completely shut off and other viewing sites are available." In evaluating the effect on historic values, as mandated both by 33 C.F.R. § 320.4(a) in connection with the public interest review and independently by section 320.4(e), the Engineer limited his inquiry to the buildings along North Water Street. Plaintiffs allege that the failure to include the lighthouse in this assessment violated the Corps regulations and, more importantly, the provisions of the National Historic Preservation Act (NHPA). This statute provides in relevant part:

> [T]he head of any Federal department or independent agency having authority to license any undertaking shall, prior to ... the issuance of any license, ... take into account the effect of the undertaking on any ... building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f. The Advisory Council on Historic Preservation has promulgated regulations implementing this directive. 36 C.F.R. Part 800. In capsule form, they require an agency, in conjunction with the appropriate state office, to determine whether the undertaking will have an adverse effect on any property listed in or eligible for inclusion in the National Register of Historic Places lying within the "area of the undertaking's potential environmental impact" and then to forward that determination to the Advisory Council for comment.

■ Were these procedures applicable in the present case, the Corps unquestionably

deviated from them. Its sole communication with the Massachusetts Historical Commission consisted of a telephone call in October 1980 to ascertain whether the lighthouse had been nominated for listing in the Register.[18] And its only contact with the Advisory Council, again a telephone call to determine whether the lighthouse had been nominated, occurred on August 14, 1981— over three months after its decision. The defendants respond that NHPA was inapplicable since the lighthouse was at no time "eligible" for listing in the Register, and that in any event the Corps' consideration of the proposal's impact on the view of the lighthouse adequately addressed all NHPA concerns.

The latter contention is plainly without merit. It is true that the Advisory Council's directives impose only a procedural obligation with no direct bearing on the Corps' substantive decision. As the Department of the Interior, which decides which properties gain a listing in the Register, has indicated in its regulations:

> Having complied with this procedural requirement the Federal agency may adopt any course of action it may feel appropriate. While the Advisory Council comments must be taken into account and integrated into the decisionmaking process, the program decision rests with the agency implementing the undertaking.

36 C.F.R. § 60.2(c). Nonetheless, to suggest that the Corps necessarily would have reached the same decision had it determined or learned that the lighthouse was eligible for Register listing is entirely speculative. Its brief consideration of the view of the lighthouse cannot fill this void, particularly since the Corps failed to mention the lighthouse at all in its discussion of historic values. Thus, any noncompliance with NHPA's requirements cannot be dismissed as unimportant.

18. Although a member of the Martha's Vineyard Commission staff had earlier written to the Massachusetts Historical Commission proposing the lighthouse for inclusion in the Register (which fact was alluded to in plaintiff Wakeman's request for a hearing), no action was taken until April 1982—well after the Corps' decision—when the state commission formally submitted the nomination to the National Register. The negative response to the Corps' telephonic query in 1980 obviously referred to the lack of formal action by the commission at that time.

■ In contending that the lighthouse was not "eligible" for listing within the meaning of the statute and thus did not trigger the Advisory Council's regulations, the defendants point to the absence of any official determination of eligibility by the Interior Department, the Advisory council or the Massachusetts Historical Commission. The Advisory Council regulations, however, belie any suggestion that the Corps can passively rely on other agencies to satisfy its responsibilities under NHPA. "Eligible property" is defined as "any district, site, building, structure, or object that *meets* the National Register Criteria," 36 C.F.R. § 800.2(f) (emphasis added)—not any structure that *has been determined* to meet such criteria. More specifically, the regulations speak of an agency's "affirmative responsibilities to locate and identify eligible properties that are within the area of the undertaking's potential environmental impact and that may be affected by the undertaking." *Id.* § 800.4(a)(2). And although the Interior regulations provide for the issuance of "Determinations of Eligibility" by the Secretary, 36 C.F.R. Part 63, this procedure is invoked only upon request by a federal agency, *id.* § 63.2, and indeed must be invoked whenever the federal or consulting state agency determines that the criteria have been met or that a question exists with respect thereto. 36 C.F.R. § 800.-4(a)(3); *see Stop H–3 Assoc. v. Coleman,* 533 F.2d 434, 441 n. 13 (9th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). It is thus apparent that the absence of any official determination of eligibility here did not render the statute inapplicable.[19]

Since it cannot be said on the present record that the lighthouse is clearly ineligible for inclusion in the Register, the court will remand to enable the Corps also to address this issue in accordance with the applicable regulations. The court of course wishes to be understood as expressing no view on the outcome of this specific issue or on the Corps' ultimate decision whether to grant or deny a section 404 permit to the private defendants.

Plaintiffs' motion for summary judgment is ALLOWED. Defendants' motion for summary judgment is DENIED. Case is remanded for further proceedings in accordance with this opinion.

So ORDERED.

---

**19.** To the extent that the alternative holding in *Committee to Save the Fox Bldg. v. Birmingham Branch of the Fed. Reserve Bank,* 497 F.Supp. 504, 512 (N.D.Ala.1980), is to the contrary, the court deems it inconsistent with the clear import of the Council's regulations. No inconsistency, however, is necessarily apparent, since the *Fox* court suggested that the regulations were applicable despite the absence of any eligibility determination. *See id.* at 513.