Virginia DALSIS and David
Wisner, Plaintiffs,

v.

Carla A. HILLS, Secretary of Department
of Housing and Urban Development, et
al., Defendants.

Civ. No. 76–450.

United States District Court,
W. D. New York.

Dec. 3, 1976.

Richard J. Lippes, Sargent & Lippes, Buffalo, N. Y., for plaintiffs.

Edward J. Wagner, Asst. U. S. Atty., Richard J. Arcara, U. S. Atty., Buffalo, N. Y., for defendants Hills and Cerabone.

David M. Franz, Shane & Franz, Olean, N. Y., for defendants Butchello and L'Alcove.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

A store proprietor and a non-resident property owner seek to enjoin construction already in progress of an enclosed shopping mall in the City of Olean, New York at its presently contemplated size. They allege that the Department of Housing and Urban Development ("HUD") failed to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 et seq., in that (1) an environmental impact statement ("e. i. s.") was not prepared and (2) HUD's determination that no adverse environmental impact would result from the mall's construction did not take into account increased traffic congestion and possible urban decay and deterioration in downtown Olean. It is further alleged that HUD did not consider alternatives to the enclosed mall, such as refurbishing the existing business edifices. The case is presently here on plaintiffs' motion for a preliminary injunction.

It is well settled that the decision on whether to grant preliminary injunctive relief falls within the sound discretion of the court. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). A court's discretion in this area is fettered, however, and a preliminary injunction should issue only upon a clear showing of either

" * * * (1) probable success on the merits *and* possible irreparable injury *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973).

It should be noted that these standards are disjunctive and that, if plaintiffs satisfy either, preliminary relief would be appropriate. Each test has two component parts, both of which must be met by plaintiffs before a preliminary injunction may issue. In addition, in order to satisfy the balancing of hardships test, a party seeking preliminary relief must also make an affirmative showing of irreparable harm. *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976). A review of the allegations and issues which will affect the ultimate disposition of the instant case provides a basis upon which to determine whether such standards have been satisfied.

Defendants allege that plaintiffs lack standing to bring this action because they seek merely to protect themselves from economic competition. In order to establish standing to bring an action pursuant to NEPA, plaintiffs must satisfy a two-pronged test. They must allege that they have suffered or will suffer an injury in fact and that they seek to protect an interest tenably within the zone of interests protected by NEPA. *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In addition to protecting their economic self-interest, plaintiffs are allegedly seeking to avert blight and deterioration of the central business district in Olean which might be a subsequent consequence of their and others' economic misfortunes. This interest arguably falls under the protective umbrella of NEPA and plaintiffs thus appear to have

standing to bring this action. *Trinity Episcopal School Corp. v. Romney*, 523 F.2d 88, 93 (2d Cir. 1975). Defendants' reliance on *Clinton Community Hospital Corp. v. Southern Maryland Medical Center*, 374 F.Supp. 450 (D.Md.1974), *aff'd per curiam*, 510 F.2d 1037 (4th Cir. 1975), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975), and the cases cited therein is misplaced. In the instant action, plaintiffs are not attempting solely to shield themselves from economic competition and their interest in preventing the environmental degradation of the central business corridor is not remote, speculative or conjectural. The distinct possibility that competition from stores in the proposed mall would encroach upon established businesses in Olean was expressly considered by HUD in its special environmental clearance.

■■■ The urban renewal project culminating in the development of the mall is a "major federal action" within the meaning of NEPA. 42 U.S.C. § 4332. A major federal action includes a decision of a federal agency which permits action to be undertaken by private parties which will affect the quality of the environment. *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1088 (1973). In the case at hand, HUD gave its approval with knowledge that a private developer would build the mall. This decision, together with the funding of the initial demolition of substandard buildings, was sufficient to satisfy NEPA's "major federal action" prerequisite. Defendants' citation of *San Francisco Tomorrow v. Romney*, 472 F.2d 1021 (9th Cir. 1973) is unavailing. That case held merely that HUD's amendatory grant of funds in order to provide for the rising costs of land acquisition and relocation of displaced residents and its contractual right to monitor the project as it developed in order to assure compliance with statutory and contractual requirements did not constitute major federal action. Whether HUD's initial approval for federal financing constituted the requisite federal action was not at issue. The instant action deals with HUD's funding of the demolition of substandard structures and its initial approval of the mall project pursuant to a special environmental clearance and not merely subsequent amending actions or any right to monitor. HUD's initial funding of the demolition in Olean to facilitate urban renewal and its subsequent approval of the mall indubitably constituted major federal action as contemplated by NEPA.

Defendants argue that the private redeveloper, L'Alcove Castle, Inc. ("L'Alcove"), is not subject to the comprehensive reach of NEPA because it is a non-federal entity and did not directly receive any federal funding for its redevelopment project. Acceptance of this contention would render NEPA a "paper tiger".

■■■ It is well settled that a non-federal entity, such as a private redeveloper, may be enjoined where it has entered into a partnership or joint venture with HUD or has been the recipient of federal funds. *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974); *Silva v. Romney*, 473 F.2d 287, 289–90 (1st Cir. 1973). The partnership or joint venture need not exist in a formal sense and the funds need not be directly received. Rather, a factual analysis must be undertaken to determine if a sufficient interrelationship exists which would make it not unfair to enjoin the private developer in order to effectuate the policies and purposes of NEPA. *Proetta v. Dent*, 484 F.2d 1146 (2d Cir. 1973). In the present case, the nexus between L'Alcove and HUD is sufficient to warrant enjoining such developer if HUD has failed to comply with the statutory requirements of NEPA.

■■■ In addition, L'Alcove could not lawfully have started the redevelopment project without HUD's approval. HUD initially directed the Olean Urban Renewal Agency ("OURA") to stop any further progress on the development of the mall until it had completed its environmental clearance study. Upon HUD's subsequent authorization, OURA transferred the land in question and gave its approval for the mall project to L'Alcove. Because HUD's approval was required to begin the project, L'Alcove may be enjoined even though it is

a non-federal entity and had commenced construction pursuant to HUD's authorization if it evolved that HUD had improperly determined that an e. i. s. was not necessary. *Biderman v. Morton, supra*, at 1147; *Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412 (2d Cir. 1972), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

 Laches is available as a defense in actions brought by private parties to enforce compliance with NEPA. *Lathan v. Volpe*, 455 F.2d 1111 (9th Cir. 1971). This equitable doctrine focuses on whether plaintiffs should be permitted to proceed with their claims notwithstanding that their delay in bringing suit induced a change in defendants' position. *Concerned About Trident v. Schlesinger*, 400 F.Supp. 454, 478 (D.D.C.1975). The defense of laches is bottomed on the principle that equity aids the vigilant, not those who sleep on their rights. *Powell v. Zuckert*, 125 U.S.App.D.C. 55, 366 F.2d 634, 636 (1966). A determination of laches *vel non* depends upon the particular facts and circumstances of each case and is primarily addressed to the sound discretion of the Court. *Burnett v. New York Central R. Co.*, 380 U.S. 424, 435, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965).

 Three independent criteria must be satisfied before laches can be found. Defendants must show that plaintiffs delayed in asserting their rights or claims, that such delay was not excusable and that there resultantly was undue prejudice to the defendants. *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975). Laches involves questions both of timeliness and diligence. There is no fixed or prescribed time frame within which plaintiffs must institute suit. The reasonableness of delay varies with the facts and circumstances of each case. *Clark v. Volpe*, 342 F.Supp. 1324 (E.D.La.1972), *aff'd per curiam*, 461 F.2d 1266 (5th Cir. 1972).

Because this matter is presently before this Court solely on plaintiffs' motion to enjoin preliminarily further construction of the proposed mall, an evidentiary hearing on the defense of laches is unnecessary at this time. Sufficient undisputed facts have been alleged and documented by the parties to enable me to assess the effect of this defense on the probability of plaintiffs' succeeding on the merits of their case and on the other tests which must be satisfied for preliminary relief.

By letter dated February 22, 1974, HUD advised OURA that an analysis of the environmental impact of the proposed mall had been completed and that a mall of approximately 250,000 leasable square feet would have no adverse environmental impact on the quality of the human environment.[1] On March 21, 1974, OURA approved the site plan submitted by L'Alcove and authorized the construction of a mall not to exceed 250,000 leasable square feet. On March 26, 1974 OURA deeded 8.79 acres, the land which was subject to HUD's clearance, to L'Alcove. These events were well publicized in the Olean area by the news media. Thus, plaintiffs' delay in bringing the instant action perhaps is appropriately measured from March 1974 at which time HUD issued its environmental clearance and OURA authorized L'Alcove to proceed with construction of the mall with the specified size limitation. Defendants' contention that plaintiffs' delay should be measured from the time OURA applied for funds to demolish substandard buildings in January of 1970 is unpersuasive. A suit filed prior to HUD's determination of the proposed mall's environmental impact would have been premature. Notwithstanding that plaintiffs were apprised, or at least chargeable with notice, of these transactions, they did not file the instant complaint until October of 1976. Construction on the mall had started four months earlier which highlights the detrimental impact upon L'Alcove of plaintiffs' tardiness.

In a recent case, the Second Circuit Court of Appeals held that laches was a bar to

---

1. Frank D. Cerabone, HUD's Area Director, stated by affidavit that the present proposal for

284,000 leasable square feet is consistent with HUD's environmental clearance.

enjoining construction already in progress of a new postal facility. *City of Rochester v. United States Postal Service*, 541 F.2d 967 (2d Cir. 1976). Therein the Postal Service had decided to relocate a post office terminal from downtown Rochester to suburban Henrietta. Plaintiffs had knowledge of the plan in March of 1974. In June of 1974, the Postal Service announced that it had entered into an agreement to purchase the Henrietta site. Construction of the facility began in August of 1975, which event was publicized in the newspaper. Correspondence was exchanged between the parties for several months prior to the commencement of the action. Plaintiffs, however, did not determine to take legal action until November of 1975 and even then did not file suit until January 14, 1976, by which time construction of the new facility was 18 per cent completed. The court held that the construction of the Henrietta facility had proceeded to a point where it was impractical for economic reasons to enjoin further development. It is significant for purposes of the case at hand that the appellate court further concluded that a stay of construction, pending preparation of an e.i.s., would not serve the public interest because further construction, *in and of itself*, would not create such an adverse environmental impact, beyond that already incurred by partial construction, as to outweigh the public interest in averting the economic waste of midstream termination of the project.

 The continued construction of the Olean mall *by itself* will not have any detrimental or adverse environmental impact. Plaintiffs do not allege that it would, but only contend that the subsequent operation of those retail establishments which would rent space in the mall would compete to an excessive degree with the existing retail businesses. This, plaintiffs assert, would result in blight and deterioration to the downtown business corridor. I am mindful that laches is a doctrine of equity that is infrequently invoked in environmental cases due to the strong public interest in effecting compliance with NEPA. *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir.

1975). However, in the present case, it does not appear that the public interest would be served by enjoining ongoing construction which in and of itself would not result in blight and deterioration to downtown Olean after the plaintiffs have delayed for so long in bringing suit. There has been no diligence on the part of the plaintiffs and the delay was not reasonable under the circumstances as they were well aware of the mall's progress. *See, Iowa Student Public Interest Research Group v. Callaway*, 379 F.Supp. 714 (S.D.Iowa 1974).

In addition, this is not a case involving a potential adverse environmental impact to the natural beauty and ecological balance of a park or lake where the public interest in preserving our unspoiled natural environment can be said to be paramount. *See, Steubing v. Brinegar, supra; Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693 (2d Cir. 1972). In such cases, courts have sought to avert the possibility of irreparable harm to the environment by refusing to allow the equitable doctrine of laches to bring about an unjust and inequitable result. The situation at hand is far removed from those presented in such cases and involves merely the building of a commercial structure in an already predominantly commercial area. The rationale and holding of *City of Rochester* would appear controlling in that plaintiffs' delay cannot be excused and defendants would suffer undue prejudice if a preliminary injunction were to issue.

The scope of judicial review of HUD's threshold determination that an e.i.s. was not required under § 102 of NEPA, 42 U.S.C. § 4332, is limited. The function of a reviewing court is to determine whether HUD's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Hanly v. Kleindienst ("Hanly II")*, 471 F.2d 823, 830 (2d Cir. 1972) *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). Therein, in order to aid in the application of these standards, the court formulated two relevant factors which an agency must consider in its initial determination. In deciding

whether a major federal action will significantly affect the quality of the human environment, the agency must take into account "(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." *Hanly II, supra,* at 830–1. The court also noted that, where a project conforms to existing uses in a particular locale, its adverse consequences will usually be less significant than where it represents a radical departure from the uses of the common or surrounding area. *Hanly II, supra,* at 831.

HUD's actions in the instant case conformed to the above standards. In its special environmental clearance, HUD determined, based upon its analysis, that an e. i. s. was not required inasmuch as the mall project would not have an adverse environmental impact. This special environmental clearance was specifically directed to the issue raised by plaintiffs whether the City of Olean could economically assimilate a commercial mall of approximately 250,000 leasable square feet. HUD analyzed economic data relating to the relevant market area from which the new mall would draw its customers, including population changes, gross and disposable income, total household retail sales, and competition from shopping facilities in nearby towns. It is significant that HUD considered the rent differential between mall tenants and existing retail establishments in Olean, the formers' rents being considerably higher than the latters'. This differential cannot be a competitive disadvantage for the older businesses. Furthermore, HUD explicitly considered that the mall would capture at least 21% of the business from the central shopping district in Olean and took into account the problem of vacant buildings in such district. HUD also noted that Olean merchants lose business to metropolitan Buffalo because the Olean area lacks a quality department store.

One of the plaintiffs' principal contentions is that HUD ignored the findings of its area economist, James W. Bryant, who estimated that 30% of Olean's retail sales would be diverted to the mall. This estimate, however, must be read in light of the other conclusions he drew throughout his statement. He conceded that the potential economic competition with mall tenants would be offset somewhat by the substantial rent differential and concluded that existing businesses would be in a strong position to compete on the basis of price with businesses which chose to locate in the mall. In addition, he stated that marginal businesses in Olean would soon be forced to close in any event and that the competition which the mall would offer would have a salutary effect on viable businesses by fostering improved managerial techniques. He also noted that the mall would induce more customers from the market area to shop in Olean and could increase the aggregate volume of sales of the established retail businesses. Although Bryant was concerned with the economic feasibility of the proposed mall, he concluded that a mall of 250,000 leasable square feet should be approved because the redeveloper was bearing the risk of the project.

■ In reaching its conclusion that the scale of the mall project would not result in an adverse environmental impact, HUD expressly considered that marginal businesses may suffer detrimental effects. HUD found, however, that there would not be a substantial number of vacancies in downtown Olean with concomitant urban blight and decay. These findings do not violate the arbitrary and capricious standard. HUD took into account both the extent of the adverse environmental effects of the mall beyond those already caused by or attendant upon the existing downtown commercial area and the absolute environmental impact of the mall itself. *Hanly II, supra,* at 830–1.

In addition, the court's reasoning and analysis in *Hanly v. Mitchell ("Hanly I"),* 460 F.2d 640 (2d Cir. 1972), is pertinent to the matter at hand. Therein, the court

upheld the determination of the General Services Administration ("GSA") that the office building portion of a proposed courthouse annex would have no adverse effects on the environment. In so holding, the court emphasized that the area was already characterized by government buildings, including several courthouses and office buildings. The court then concluded that, whatever the theoretical environmental impact of a nine-story office building may be, its actual impact in those circumstances would be minimal and was adequately accounted for in GSA's terse memorandum granting environmental clearance. *Hanly I, supra,* at 646. This case lends further support to a conclusion in the case at hand that HUD fulfilled its requirements under NEPA before giving its approval to the mall project. The mall would not differ substantially from the makeup of the downtown commercial area and it would not in absolute terms give rise to sizable adverse environmental effects. *Hanly II, supra,* at 832.

Plaintiffs' contention that HUD failed to consider increased traffic congestion [2] and alternatives to the mall, such as refurbishing the existing business corridor, must be considered in the light of the relief sought. Plaintiffs do not seek to have the mall project halted, but want only a reduction in its size. There is nothing to indicate that the increase in traffic congestion resulting from a 284,000 square foot mall rather than from a 250,000 square foot mall (or even than from the 220,000 square foot one contended for by plaintiffs) would be significant in the current context. In addition, the alternative of refurbishing the existing business corridor is irrelevant here because plaintiffs seek only to reduce the size of the mall and not to eliminate it. Because they do not question the propriety of the mall itself, they cannot now assert that refurbishment as the alternative should have been considered. Furthermore, HUD had initially funded the demolition of buildings in Olean in order to facilitate urban renewal. After this project had been completed and the land readied for redevelopment, OURA requested HUD's approval for the mall project and HUD issued its special environmental clearance. At this state of urban renewal with vacant land awaiting new development, the refurbishment of existing business properties as opposed to building a new shopping mall on the vacant land is at best debatable. The failure to consider such an alternative does not justify preliminary injunctive relief.

In balancing the hardships between the parties, the scales do not tip decidedly, if at all, in plaintiffs' favor. The cited potential environmental harm is not imminent and will not directly result from the mall's construction. On the other hand, L'Alcove has made a substantial financial investment in the project to bring its construction to its current stage. L'Alcove has spent approximately $1,853,000 on land acquisition and construction to date and is obligated by contract to purchase construction material and equipment totalling $2,558,000. L'Alcove is presently erecting the mall's steel frame and exterior walls and its "downtime" would be $400 per day. L'Alcove has already leased 87% of the mall and these leases permit the lessees to cancel if the mall is not completed by a certain date. It should also be noted that the mall is being constructed not only on the 8.79 acres purchased from OURA but also on approximately 18 additional acres privately acquired by L'Alcove.[3]

As stated earlier, irreparable harm is a necessary ingredient under either test for

---

**2.** The parking area adjacent to the mall must be at a ratio of not less than three square feet for each one square foot of net leasable floor space. Implicit in such a requirement is consideration of the volume of traffic expected at the mall.

**3.** Although defendants asserted at oral argument that they were about to enter the private money market to borrow additional funds to continue the project, no affidavits or other documentation have been presented to substantiate such claim. Thus, foreclosure of L'Alcove's ability or inability to borrow has not been considered in assessing the hardship it would suffer.

preliminary relief. *Triebwasser & Katz v. American Tel. & Tel. Co., supra.* The continued construction of the mall will not, by itself, irreparably harm plaintiffs or the environment. Plaintiffs assert that excessive competition from retail stores in the mall would lead to blight and decay. This harm to the environment will not be caused, however, by the continued construction of the mall, but will only arise, if at all, when stores in the mall actually compete to an excessive degree with the existing businesses. Any potential harm to the environment is attenuated because, only when a substantial number of stores should be forced to close, would any deterioration occur. The failure of only marginal businesses should not lead to irreparable harm. Moreover, the salient fact remains that the mall's construction itself would not irreparably damage the environment. In addition, there is the fair probability that some of the additional space to be rented in the mall would be used for purposes other than retail sales, such as for theatres, restaurants, offices and other uses found in typical shopping malls. Any such would attract customers to the Olean downtown area and the established merchants would *pro tanto* be benefitted.

Because plaintiffs have not made an affirmative showing that irreparable harm would result from continued construction of the mall, preliminary relief enjoining such ongoing construction is precluded.

It is therefore hereby

ORDERED that plaintiffs' motion for preliminary injunction is denied.