**MALL PROPERTIES, INC., Plaintiff,**

v.

**John V. MARSH, Defendant.**

**Civ. A. No. 85–4038–W.**

United States District Court,
D. Massachusetts.

Sept. 8, 1987.

---

Mark A. Chertok, Alice E. Richamond, Hemenway & Barnes, Boston, Mass., for plaintiff.

David E. Dearing, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Peter Shelley, Conservation Law Foundation, Boston, Mass., for Connecticut Fund.

Katherine Robinson, Hartford, Conn., for Connecticut Fund for the Environment.

Roberta Friedman, Jonathan Einhorn, P.C., New Haven, Conn., for New Haven League of Women Voters.

Neil Proto, Kelley, Drye & Warren, Stamford, Conn., Frank Cochran, Peter Cooper, Cooper, Whitney & Cochran, New Haven, Conn., Edward Larson, Weston, Patrick, Willard & Redding, Boston, Mass., James T.B. Tripp, Michael Herz, Environmental Defense Fund, New York City, for City of New Haven.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Mall Properties, Inc., a developer of shopping malls, brought this action, seeking an order vacating the denial by the U.S. Army Corps of Engineers (the "Corps") of an application for a permit under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act, 33 U.S.C. §§ 403 and 1344 (1982). The permit is required for the development of a proposed mall on a site in the Town of North Haven, Connecticut.

The court finds that the Corps' order denying the permit must be vacated because its decision was not made in accordance with law. Rather, the Corps exceeded its authority (1) by basing its denial of the permit on socio-economic harms that are not proximately related to changes in the physical environment and (2) by not following its regulations which required that Mall Properties be provided notice and an opportunity to attempt to reverse or rebut an objection to the construction of the proposed mall made by the Governor of Connecticut. These errors require a remand of the case to the Corps.

## I. BACKGROUND

Mall Properties is an organization which for many years has sought to develop a shopping mall in the Town of North Haven, Connecticut. North Haven is a suburb about ten miles from New Haven, Connecticut.

As the proposed development would involve the filling of certain wetlands and open waters, Mall Properties must obtain a permit from the Corps pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344 ("Section 404") and Section 10 of the Rivers and Harbor Act, 33 U.S.C. § 403 ("Section 10"). Although "the Corps administers a dual permit system under two different statutes ... to regulate dredge and fill activities," *United States of America v. Cumberland Farms*, 826 F.2d 1151 (1st Cir.1987), the procedures and standards utilized by the Corps, and in dispute in the instant case, are equally applicable to both acts. *See* 33 C.F.R. § 320 (1986).

The City of New Haven has consistently opposed development of the mall. It claims that a North Haven mall will jeopardize the fragile economy of New Haven, which all levels of government have long been seeking to revitalize. New Haven has actively participated in proceedings before the Corps and in this litigation.[1]

As required by law, 33 C.F.R. § 320.4(a), the Corps conducted a public interest review in connection with deciding whether to issue Mall Properties the requested permit.

---

1. The court allowed New Haven to intervene as a defendant in this action under F.R.Civ.P. 24. *See* Memorandum and Order, May 12, 1986. Three environmental groups—the Connecticut Fund for the Environment, the Environmental Defense Fund, and the Conservation Law Foun- dation—were denied leave to intervene, but allowed to inform the court of their views as *amicus curiae. Id.* These groups may also present their arguments to the Corps in the proceedings which must be conducted pursuant to the remand of this case.

Acting for the Corps in this matter was Colonel Carl B. Sciple.

On August 25, 1985, Colonel Sciple denied Mall Properties' request for a permit. In the Record of Decision ("ROD") providing the explanation for the denial, Colonel Sciple concluded by summarizing the relative roles of various factors in his decision. He wrote:

I have considered many factors in my public interest review of the applicant's proposal. Land use is one of those factors, and I recognize that the decision of state and local governments is conclusive as to that factor. In the matter under consideration, the views of the state and the local government about the proposed project are different. While the land may be used for a shopping mall under North Haven's zoning regulations, the Office of Policy and Management, Comprehensive Planning Division, of the State of Connecticut has taken the position that the development of a shopping mall at North Haven is inconsistent with the state's conservation and development policies. But even where state and local authorities give zoning or other land use approval, a person conducting a public interest review must make a thorough objective evaluation of an application in full compliance with applicable laws and regulations (See 49 FR 39478 and 39479). Therefore, in my public interest review I considered factors other than land use. Those factors, where applicable, are listed in 33 Code of Federal Regulations Section 320.4(a), namely, conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, flood hazards, flood plain values, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, flood and fiber production, mineral needs, considerations of property ownership, and, in general, the needs and welfare of the people.

The resubmission [2] presented on-site wetland mitigation to compensate for the most important wetlands lost. Portions of parking areas would be raised, and additional flood storage was proposed to lessen previous flooding impacts. Socio-economic impacts to New Haven were proposed to be mitigated by the opening of three anchor stores in 1987, delaying until 1991 the opening of the fourth anchor store, contributing $100,000 in job training funds to the city of New Haven, and petitioning the transit authority to provide bus service for potential mall employees of New Haven.

[The Colonel found that] although there is still a net loss in wetland resources, the proposed on-site wetland creation, if successfully developed, would substantially compensate for lost value of the most important seven acres of wood swamp and freshwater marsh. Flooding impacts, although lessened further and not major, are nonetheless troublesome to me when viewed against the policies of the flood plain executive order and one of the Corps basic missions of providing flood protection.

*Still weighing most heavily, however, is my concern for the socio-economic impacts this project would have on the city of New Haven.* I had encouraged the applicant to meet with the Mayor of New Haven with the hope that they would find common ground. Even though they met, it was to no avail. While the applicant has made proposals to mitigate socio-economic impacts, including the most recent one described above, he has not, in my view, gone far enough.

The Hartford regional office US Department of Housing and Urban Development has expressed concerns about the mall from a national and Federal perspective. (Recently there has been an indication that these views might be tempered at its Washington level.) Local elected leaders have differing views on the Mall. The First Selectman of North Haven favors the Mall, the Mayor of New Haven is opposed to the Mall. At the State level, the Connecticut Office of

---

**2.** A proposed Final Order denying the permit was issued on November 24, 1984. Mall Properties subsequently submitted proposed modifications which the Corps agreed to consider.

Policy and Management, Comprehensive Planning Division has stated that the Mall is contrary to state urban policies. *Also, during my July 1985 meeting with Connecticut's Governor O'Neill, he indicated that he felt it was not worth the risk to New Haven of building the North Haven Mall.* I have therefore concluded, that this project is contrary to the public interest and the permit is denied.

ROD pages 45 to 47. (Emphasis added).

Mall Properties subsequently filed this action requesting that the order denying the permit be vacated. In the course of this case Mall Properties withdrew its initial request for injunctive relief in the form of an order requiring issuance of the permit. Thus, it is not disputed that remand to the Corps is the sole appropriate remedy if Mall Properties prevails in this action.

Mall Properties requests that the order denying its permit be vacated primarily on the ground that the Corps improperly relied on the effect that the North Haven mall would have on the economy of New Haven in reaching its decision. Mall Properties also contends that the Corps acted illegally in receiving and relying upon an objection to the mall by the Governor of Connecticut which it was not afforded an opportunity to address.[3] The defendants assert that Mall Properties' claims are incorrect as matters of law.

The parties filed cross-motions for summary judgment. They agree that the material facts are not in dispute. A hearing was held on the cross-motions. Thus, the case is ripe to be decided.

## II. THE STANDARD OF REVIEW

The standard of review to be applied in this case is established by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D) (1982). "The applicable scope of review calls for determination of whether the Corps' action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of procedure required by law.' "

*Hough v. Marsh,* 557 F.Supp. 74, 79 (D.Mass.1982) (quoting from 5 U.S.C. § 706(2)(A)(D)). *See generally Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## III. CONCLUSIONS OF LAW

A. *The Corps' Reliance On The Socio-Economic Impacts On New Haven Was Not In Accordance With Section 404, Section 10, or The Corps' Public Interest Review Regulations.*

As the ROD states, the factor "weighing most heavily" in the Corps' decision to deny Mall Properties a permit was the "concern for the socio-economic impacts this project would have on the City of New Haven." ROD at 46. The record reveals that these impacts would not result from any effect the mall would have on the physical environment generally or wetlands particularly. Rather, it is the economic competition for New Haven which would result from the mere existence of a mall anywhere in North Haven which was the most significant factor in the Corps' decision to deny the permit. The Corps did find that there was no alternative site for the mall in North Haven. This, however, does not alter the fact that there is in this case no proximate causal relationship between the impact of the proposed development on the natural environment and the economic harm to New Haven which the Corps deemed most significant in denying the permit.

Mall Properties contends that while certain economic factors may properly be considered by the Corps in deciding whether to grant a permit, the Corps has not been empowered generally to regulate economic competition between communities and to make political decisions as to which community's economic interests ought to be preferred.

The defendants contend that the Corps has the unqualified right and responsibility to consider economics in deciding whether

---

**3.** Mall Properties' complaint also alleges several other grounds for vacating the Corps' order which, because the case is being remanded, it is not necessary to address.

to issue a permit. They note that the relevant Corps regulations state that the Corps review has "evolved from one that protects navigation only to one that considers the full public interest...." 33 C.F.R. § 320.1(a). *See generally,* Power, *The Fox in the Chicken Coop: The Regulatory Program of the U.S. Army Corps of Engineers,* 63 Va.L.Rev. 503, 526–29 (1977) (describing evolution of Corps jurisdiction from the manageable job "of determining whether proposed structure impedes maritime traffic to public interest balancing."); Rodgers, *Environmental Law Air and Water* 205 (1986) ("Here is the corps famed 'public interest' review that reads like a parody of standardless administrative choice."); *1902 Atlantic Ltd. v. Hudson,* 574 F.Supp. 1381, 1398 n. 16 (E.D.Va.1983).

As explained below, consideration of the purposes of Section 404 and Section 10, the relevant provisions of those laws, the "public interest" review regulations of the Corps, and the pertinent case law persuades the court that the Corps' action in this case was not in accordance with law. More specifically, the court concludes that in deciding whether to grant a permit the Corps may consider economic effects which are proximately related to changes in the physical environment. The Corps may not, however, properly consider and give significant weight to economic effects unrelated to the impact which a proposed project will have on the environment. Thus, the Corps exceeded its authority in this case.

Section 404 (33 U.S.C. § 1344) states:

(a) The Secretary [of the Army] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified sites.

\* \* \* \* \* \*

(b) Subject to subsection (c) of this section, each disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines ... which ... shall be based upon criteria comparable to the criteria applicable to

the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

The Secretary's authority to act under this provision has been delegated to the Corps. 33 C.F.R. § 320.2(f).

Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 states:

[I]t shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of ... any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

The Secretary's authority under this provision has also been delegated to the Corps. *See* 33 C.F.R. § 322.5.

In making its economic analysis in this case, the Corps relied on the public interest review regulation expressly applicable to both Section 404 and Section 10. That regulation, 33 C.F.R. § 320.4(a), provides that in deciding whether to issue a permit the Corps must conduct a public interest review balancing the

benefits which reasonably may be expected to accrue from the proposal ... against its reasonably foreseeable detriments.[4] ... Among [the factors to be considered] are conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood-plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership, and in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a).

The scope of the economic analysis to be conducted by the Corps is not directly ad-

**4.** These provisions explicitly apply to both the Clean Water Act and the Rivers and Harbors Act.

dressed in the regulations. Rather, although "economics has been included in the Corps' list of public interest factors since 1970.... there has never been a specific policy on economics in the regulations." 51 Fed.Reg. 41207 (1986).

Therefore, the court in this case is called upon to discern the scope of the authority to consider economic factors which has been delegated to, and exercised by, the Corps. It is axiomatic that this decision must take into account the legislative intent reflected by the stated purposes and policies of the relevant statutes.[5] More specifically, as the Supreme Court has stated in addressing the effects which may be properly considered in deciding whether an Environmental Impact Statement ("EIS") is required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., courts must in cases such as this consider the underlying policies of the relevant statute in deciding whether an actor should be held responsible under that statute for certain effects of his actions. *Metropolitan Edison Co. v. People Against Nuclear Energy et al.*, 460 U.S. 766, 774 n. 7, 103 S.Ct. 1556, 1561 n. 7, 75 L.Ed.2d 534 (1983) ("In the context of both tort law and NEPA, courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.").

"Section 404 of the Clean Water Act was enacted 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' 33 U.S.C. § 1251(a) (1976) (section entitled 'Congressional declaration of goals and policy')." *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983). The plain statement of legislative purpose contained in § 1251(a) is echoed in the legislative history which indicates that Section

404 was enacted "to protect the quality of water and to protect critical wetlands...." 3 Legislative History of the Clean Water Act of 1977, 95th Congress 2d Sess. at 532 (1978). Thus, the purpose of Section 404 suggests that the scope of economic inquiry which the Corps has been authorized to conduct is confined to consideration of effects related to alterations in the physical environment.

■ The pertinent provisions of the Clean Waters Act and the related regulations reinforce the view that Section 404 only authorizes the Corps to weigh economic effects related to changes in the physical environment. The statutory provision concerning permits for dredged or fill material under which the Corps was acting in this case is 33 U.S.C. § 1344. Section 1344(b)(1) provides that Corps' permit decisions must be governed by guidelines based upon "criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under [33 U.S.C. § 1343(c)]...." The regulations developed to implement § 1343(c) indicate that the Corps, in implementing its authority under § 1344(b), should consider "the nature and extent of present and potential recreational and commercial use of areas which might be affected by the proposed dumping," and the "presence in the material of any constituents which might significantly affect living marine resources of recreational or commercial value." 40 C.F.R. § 227.18(a) and (h). The example provided by the regulations of what should be considered is the "reduction in use days of recreational areas, or dollars lost in commercial fishery profits or the profitability of other commercial enterprises." 40 C.F.R. § 227.19. Thus, § 1344(b)(1), as implemented by the relevant regulations, indicates that the proper scope of the Corps' public interest inquiry is limited to the effects of impacts on the physical environment, such as the commercial or recreation-

---

5. As Justice Felix Frankfurter said:
   Legislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government. That aim, that policy is not drawn, like nitrogen, out of the air; it is

evinced in the language of the statute, as read in the light of other external manifestations of purpose. That is what the judge must seek and effectuate....

F. Frankfurter, "The Reading of Statutes," in *Of Law and Men* 60 (1956).

al value of areas directly affected by a change in the environment.

Section 1344(b)(2) also illuminates the proper focus of the Corps' economic inquiry. Section 1344(b)(2) provides that the Corps may issue a permit "in any case where [its] guidelines under § 1344(b)(1) alone would prohibit the [granting of a permit], through the application additionally of the economic impact of the site on navigation and anchorage." This provision has been interpreted "as justifying the Corps' approval of discharges at a site if environmentally preferable alternatives are prohibitively expensive or pose a serious impediment to navigation." Rodgers, *Environmental Law* 406 (1977).

■ Section 1344(b)(2) has two pertinent implications. First, § 1344(b)(2) does not authorize denial of permits because of economic harms; it only authorizes issuance of permits because of economic benefits that override environmental harms. Rogers, *supra* at 202. Second, and perhaps more importantly, the terms of § 1344(b)(2) again indicate that the relevant economic considerations are those directly linked to the physical environment, such as navigation and anchorage.

The statutory language, legislative history, and regulations concerning Section 10 of the Rivers and Harbors Act reinforce the view reached by the court in analyzing Section 404. Indeed, as Section 10 has evolved, it incorporates the public review standards applicable to Section 404, including the same limited authority to consider certain economic factors.

Section 10 does not expressly provide for a public interest review or list "economics" as a permissible criterion. Section 10 of the Rivers and Harbors Act of 1899 indicates that it was enacted to protect the federal government's interest in regulating the navigability of the country's waterways. *See e.g. United States v. Logan & Craig Charter Service, Inc.*, 676 F.2d 1216 (8th Cir.1982). The major concern of the legislation was obstructions in navigable waters that would interfere with interstate commerce on the waterways. *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct.

1775, 68 L.Ed.2d 101 (1981). Thus, the economic effects initially addressed by the statute are those which relate directly to changes in the physical environment.

The subsequent evolution of Section 10 does not suggest an intention to authorize consideration of economic factors with a more attenuated relationship to changes in the physical environment. In the late 1960s, increased concern about protecting the natural environment led to an expansion by regulation in the Corps' review under Section 10. *Deltona Corp. v. United States*, 657 F.2d 1184, 1187, 228 Ct.Cl. 476 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); Power, *supra*, at 510. In 1968, the Corps revised its regulations to include "public interest review." *Deltona*, 657 F.2d at 1187. Public interest review included consideration of fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest. *Id.* The March 17, 1970 report of the House Committee on Government Operations explained this expansion:

> The [Corps] which is charged by Congress with the duty to protect the nation's navigable waters, should, when considering whether to approve applications for landfills, dredging and other work in navigable waters, increase its consideration of the effects which the proposed work will have, not only on navigation, but also on conservation of natural resources, fish and wildlife, air and water quality, aesthetics, scenic view, historic sites, ecology, and other public interest aspects of the waterway.

H.R.Rep. No. 917, 91st Cong., 2d Sess. at 5 (1970).

This report indicates that although the interests to be considered under Section 10 are no longer limited to navigation, they are all directly related to impacts on the affected waterway.

In 1974, in order to "incorporate the requirements of new federal legislation" including Section 404, *Deltona*, 657 F.2d at 1187, the Corps' responsibility to conduct a public interest review under Section 10, among other provisions, was expanded to include "economics; historic values; flood

damage prevention; land use classification; recreation; water supply and water quality." *Id. See also Jentgen v. United States*, 657 F.2d 1210, 1211–12, 228 Cl.Ct. 527 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). Thus, since 1974, the Corps' public interest review under both Section 10 and Section 404 have been governed by the same regulation which is now 33 C.F.R. § 320.4. As described earlier, analysis of Section 404 indicates that the scope of the economic inquiry under 33 C.F.R. § 320.4 is limited to effects proximately caused by changes in the physical environment. The foregoing analysis of Section 10 suggests the same conclusion.

The court's conclusion that in deciding whether to issue a permit the Corps may not properly consider economic factors unrelated to impacts on the physical environment is consistent with the rulings and *dicta* in the few reported cases addressing the economic component of the Corps' public interest review. The case most directly on point is the Court of Appeals for the Fifth Circuit's decision in *Buttrey*, 690 F.2d 1170. In *Buttrey* a developer of residential homes was denied a dredge and fill permit under Section 404 to channelize a half-mile stream in Louisiana. The plaintiff argued that the Corps should have considered the public benefit that would have flowed from about three million dollars in jobs to build the houses. The Court of Appeals, however, found that "this is not the kind of 'economic' benefit the Corps' public interest review is supposed to consider." *Id.* at 1180.

Although contrary to defendants' contentions, the relevant *dicta* in *Hough v. Marsh*, 557 F.Supp. 74 (D.Mass.1982) is compatible with the decision in *Buttrey*. *Hough* involved the Corps' issuance of a permit to build two houses and a tennis court on wetlands adjacent to Edgartown Harbor on Martha's Vineyard. The court found that the proposed construction would obscure, but not eliminate, the view of the nearby Edgartown lighthouse, an attraction on sightseeing bus routes. *Id.* at 86 and 87. After deciding a remand was necessary because the developer had not demonstrated the absence of practicable alternatives, the court addressed the question of economics. It stated:

> To complete the discussion of the Clean Water Act, the court notes ... additional factors that the Corps failed to address properly in connection with the public interest review mandated by 33 C.F.R. § 320.4(a).... With respect to [economics] ... the Corps did mention the positive anticipated impact of the proposal on jobs and municipal taxes but it sidestepped any consideration of adverse economic effects—particularly ... the "elimination of an attraction (the Edgartown lighthouse) on the itinerary of sightseeing buses."

*Id.* at 86.

Thus, in *Hough* the court noted that construction on the particular property which implicated the Corps' jurisdiction would alter the physical environment, obstruct a scenic view and, as a result, have a cognizable economic effect on sightseeing bus operators. In contrast, in the present case the economic effects which the Corps deemed significant resulted from the mere existence of a mall anywhere in North Haven. These effects did not derive from the potential impact of development on the physical environment which triggered the Corps' public interest review. Thus, *Hough* is factually distinguishable from the present case. The discussion of economic harms in *Hough* is, however, also compatible with the decision in *Buttrey* and this court's conclusion that only socio-economic harms proximately related to changes in the physical environment may be properly considered by the Corps in deciding whether to issue a permit.

This court's conclusion is reinforced by the reasoning and results of analogous cases involving NEPA. *See Metropolitan Edison*, 460 U.S. at 774, 103 S.Ct. at 1561; *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985).

In *Metropolitan Edison* the Supreme Court addressed the question whether the Nuclear Regulatory Commission complied with NEPA when it did not consider the

potential psychological health effects caused by activating a nuclear reactor at Three Mile Island. Although the case involved NEPA rather than Section 404, and the harm addressed was psychological rather than economic, the Supreme Court's reasoning and result is persuasive in the present case.

In *Metropolitan Edison* the Supreme Court explained by way of background that:

All the parties agree that effects on human health can be cognizable under NEPA, and that human health may include psychological health. The Court of Appeals thought these propositions were enough to complete a syllogism that disposes of the case: NEPA requires agencies to consider effects on health. An effect on psychological health is an effect on health. Therefore, NEPA requires agencies to consider the effects on psychological health asserted by [Metropolitan Edison].

*Metropolitan Edison,* 460 U.S. at 771, 103 S.Ct. at 1560. Then the Supreme Court wrote in reversing the Court of Appeals: "Although these arguments are appealing at first glance, we believe they skip over an essential first step in the analysis. They do not consider the closeness of the relationship between the change in the environment and the 'effect' at issue." *Id.* at 772, 103 S.Ct. at 1560.

In explaining its decision the Supreme Court emphasized that NEPA was "designed to promote human welfare by alerting governmental actors to the effect of their proposed action on the physical environment." *Id.* Thus, the Court found "[t]o determine whether [NEPA] requires consideration of a particular effect, we must look at the relationship between that effect and the change in the physical environment caused by the ... federal action." *Id.* at 773, 103 S.Ct. at 1561. The Supreme Court indicated, however, that not even all "effects that are 'caused by' a change in the physical environment in the sense of

'but for' causation [need be considered] ... because the causal chain [may be] too attenuated." Rather, the Court found that NEPA "included a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Id.* at 774, 103 S.Ct. at 1561.[6] If not every effect resulting from a change in the physical environment is cognizable under NEPA, *Metropolitan Edison* makes it evident that effects unrelated to changes in the physical environment may not be considered under NEPA.

■ The present case is analogous to *Metropolitan Edison.* As discussed earlier, Section 404 and Section 10 are, like NEPA, concerned with the physical environment. When there is a reasonably close causal relationship between a change in the physical environment and economic factors, the Corps may consider those factors in its public interest review. *Metropolitan Edison,* however, indicates that the Corps may not properly consider and give significant weight to other economic factors in deciding whether to issue a permit pursuant to Section 404 or Section 10.

Similarly, once again contrary to defendants' contentions, the Court of Appeals for the First Circuit decision in *Sierra Club v. Marsh,* 769 F.2d 868 (1st Cir.1985), is also compatible with the conclusion that economic factors are cognizable by the Corps only if they are adequately related to impacts on the physical environment.

*Sierra Club* involved the question whether a cargo port and a causeway that Maine planned to build at Sears Island would "significantly affect the environment" and, therefore, under NEPA, require an EIS. *Id.* at 870. The First Circuit found a "serious omission" in the Corps' decision not to require an EIS, namely the "failure to consider adequately the fact that building a port and causeway may lead to the further industrial development of Sears Island, *and* that further development will significantly affect the environment." *Id.* at 877 (emphasis added). As the Court

6. The Corps' public interest regulations themselves contain language familiar to proximate cause analysis. 33 C.F.R. § 320.4(a)(1) states

"the benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments."

of Appeals later elaborated, the Corps had before it evidence that industrial development of the island would lead to "2,750 new jobs in a town with a population of under 2,500 ... increased traffic ... additional lost scallop beds and clam flats, more soil erosion and aesthetic harm, a need for additional waste disposal and water supply, an added threat to water quality...." *Id.* at 880. Thus, in *Sierra Club* the evidence indicated that construction causing a change in the environment would cause industrial development which would further impact the environment in significant respects. It was not an economic impact alone—but rather its relationship to the environment—which the Corps was directed to consider.

Thus *Sierra Club*, like *Metropolitan Edison*, suggests that there must be a reasonably close link between economic factors and the physical environment for the Corps to be legitimately concerned about those economic factors in performing its function under NEPA. Once again, a comparable conclusion is required when the Corps is operating under Section 404 or Section 10.

As described previously, the purposes and policies of Section 404 and Section 10, the relevant provisions of the statutes and regulations, and the case law all indicate that the Corps may not rely upon economic factors which are not proximately related to changes in the physical environment in denying a dredge or fill permit. Therefore, because the Corps gave significant weight to economic factors not related to changes in the physical environment in this case, its decision was not in accordance with Section 404 or Section 10.

### B. *The Corps' Action is Not Authorized by NEPA.*

■ The defendants contend that even if Section 404 or Section 10 does not authorize the Corps to give significant weight to the economic effect which a North Haven mall would have on New Haven in the context of this case, the NEPA statute itself provides the necessary authority. This contention, however, is incorrect.

Defendants' claim concerning NEPA relies primarily on two arguments. First, defendants rely on § 105 of NEPA, 42 U.S. C. § 4335 which states that "the policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal Agencies." *See also* Rodgers, *Environmental Law Air and Water* 204 (it is "clear that the Corps' Section 10 authority was supplemented in some uncertain way by [NEPA]."). NEPA, however, "does not expand the jurisdiction of an agency beyond that set forth in its organic statute ... and the Supreme Court has characterized 'its mandate to the agencies [as] essentially procedural.'" *Cape May Greene v. Warren*, 698 F.2d 179, 188 (3d Cir.1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)); *see also, Olmstead Citizens for a Better Community v. United States*, 793 F.2d 201, 304 (8th Cir.1986) ("[NEPA], while embodying substantive goals for the preservation of our physical environment, imposes basically procedural obligations in pursuit of these goals.").

In any event, it is not necessary to decide whether, or to what extent, NEPA enlarges the economic inquiry permitted the Corps because NEPA clearly does not authorize the reliance on the socio-economic impacts given significant weight by the Corps in this case. *Metropolitan Edison* was a NEPA case. As described earlier, it construed NEPA to authorize consideration only of harms proximately related to a change in the physical environment. That requirement is not met in this case.

The Supreme Court's decision in *Metropolitan Edison* also substantially disposes of defendants' second argument regarding the Corps' authority under NEPA. Defendants cite a series of pre-*Metropolitan Edison* NEPA cases which stated that: "When an action will have a primary impact on the natural environment, secondary socio-economic effects may also be considered." *Image of Gr. San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978). *See also Breckinridge v. Rumsfeld*, 537 F.2d 864, 866 (10th Cir.1976); *cert.*

*denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Hanly v. Mitchell,* 460 F.2d 640 (2d Cir.1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Como-Falcon Coalition, Inc. v. Department of Labor,* 609 F.2d 342, 346 (8th Cir.1979) *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *Nucleus of Chicago Homeowner's Ass'n v. Lynn,* 524 F.2d 225 (7th Cir.1975) *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1980).

In *Olmstead* the Court of Appeals for the Eighth Circuit addressed the continued vitality of such cases. 793 F.2d at 206. *Olmstead* involved the proposed conversion of a mental hospital campus into a federal prison. As in this case, the proposed action would not have had significant impacts on the physical environment. *Id.* at 206. In addressing the "oft-quoted passage," stating that socio-economic effects are to be considered when the "action at issue has a primary impact on the natural environment," *id.,* the Eighth Circuit stated:

> [I]t is unlikely that such a distinction survives the recent Supreme Court holding in *Metropolitan Edison.* That decision ... was based on congressional intent, and there is no suggestion that Congress contemplated that the process it designed to make agencies aware of the consequences of their actions with regard to the physical environment would be converted into a process for airing general policy objections anytime the physical environment was implicated. Such a rule would divert agency resources away from the primary statutory goal of protecting the physical environment and natural resources, just as in *Metropolitan Edison. See* 460 U.S. at 776, 103 S.Ct. at 1562. Furthermore, courts even before *Metropolitan Edison* had commented on the anomaly of requiring that an agency consider impacts not sufficient to trigger preparation of an ecological statement just because such a statement was required for other unrelated reasons. *E.g., Citizens Committee Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 534 (S.D.Ohio 1982). Olmstead Citizens' concerns with

crime and property values would exist regardless of any physical changes to the former mental hospital campus.

*Id.* The Eighth Circuit's reasoning is equally compelling in the instant case.

In addition, even if it were permissible for the Corps to consider unrelated socio-economic effects if the proposed project has a primary impact on the natural environment, such consideration would not be appropriate in this case. Here, as in *Olmstead,* the primary impacts which concerned the Corps did not involve the physical environment. Rather, the Corps candidly stated that socio-economic effects "weighed most heavily" in its decision. ROD at 46. Thus, the cases on which defendants substantially rely are inapposite even if their persuasive value is not, as the court finds, eliminated by *Metropolitan Edison.*

Finally, the court has particularly considered two cases upon which the defendants rely heavily. The first is *Hanly* in which the Second Circuit explained that the:

> National Environmental Policy Act contains no exhaustive list of so-called "environmental considerations," but without question its aims extend beyond sewage and garbage and even beyond water and air pollution.... The act must be construed to include protection of the quality of life for city residents.

460 F.2d at 647. In *Hanly,* the Court of Appeals found that placement of a jail in a narrow urban area directly across the street from two large apartment houses presented problems of noise, fears of disturbances, traffic problems and other "environmental considerations" within NEPA. The court then found the General Services Administration did not give adequate consideration to the factors relating to the quality of city life.

Although *Metropolitan Edison* apparently qualifies at least parts of the *Hanly* ruling, particularly the reliance on fears of disturbances, the close proximity of the jail to the apartment houses, and the court's focus on noise, traffic problems and other

"environmental considerations" suggests that many of the harms in *Hanly* were proximately related to the change in the physical environment which would be caused by the construction of the jail. Thus, *Hanly* is factually distinguishable from the instant case.

The other case heavily relied on by the defendants is *Dalsis v. Hills*, 424 F.Supp. 784 (W.D.N.Y.1976). *Dalsis* involved the construction of an enclosed shopping mall in Olean, New York. The U.S. Department of Housing and Urban Development ("HUD") had funded demolition of substandard buildings on the proposed site and approved the mall.

Although the court found there was no need for an EIS, in reaching that conclusion the court engaged in an environmental analysis that involved socio-economic considerations similar to those presented in the instant case. The court indicated that the harm to the environment would be "that excessive competition from retail stores in the mall would lead to blight and decay" in the form of boarded up stores driven out of business. *Id.* at 792. It appears that this harm might be too attenuated to be cognizable under *Metropolitan Edison*. Nevertheless, there is another major difference between *Dalsis* and the instant case: the agency involved in *Dalsis* was HUD, while the agency involved in the instant case is the Corps. As the plaintiff states, "HUD's consideration of downtown business interests was necessitated by the dictates of its implementing statute; NEPA alone did not require such a result." Memorandum of Plaintiffs in Opposition to Defendant's Motion for Summary Judgment at 30. The court finds this distinction persuasive, although it recognizes the distinction is implicit rather than explicit in the district court's opinion in *Dalsis*. Drawing this distinction is consistent with the Supreme Court's conclusion in *Metropolitan Edison* that "the scope of the agency's inquiries must remain manageable if NEPA's goal of 'insur[ing] a fully informed and well-considered decision' is to be accomplished." 460 U.S. at 776, 103 S.Ct. at 1562.

## C. *Conclusion Concerning Economic Considerations.*

As set forth previously, the most significant factor in the Corps' decision to deny Mall Properties its permits was the socio-economic harm to New Haven which the Corps perceived would result from a mall anywhere in North Haven. This harm was not proximately related to any impact the development would have on the natural environment. Thus, the Corps' decision was not in accordance with law.

It is elementary, but appropriate to note, that in our system of government, decisions concerning which competing constituency's economic interests ought to be preferred are traditionally made by democratically accountable officials. The Corps seemed to recognize this when it concluded its lengthy review process by consulting the Governor of Connecticut concerning whether building a mall in North Haven was worth the risk to the economy of New Haven.

The statutes implicated in this case were enacted to protect the natural environment. Apparently the Corps was given a central role in this process because of its expertise in matters relating to our nation's waterways. There is no suggestion that it was perceived by those enacting the relevant statutes to have expertise concerning whether the economic interests of aging cities or their newer suburbs should as a matter of public policy be preferred.

This court is not now called upon to determine whether the delegation to a group of military engineers of such broad, discretionary authority to determine public policy would be legally permissible, reasonable, or desirable. Rather, the court is called upon to discern statutory intent. As the Supreme Court noted in *Metropolitan Edison*, however, a broad grant of authority to the Corps to decide general public policy issues would require an agency to seek to develop expertise "not otherwise relevant to [its] congressionally assigned functions." 460 U.S. at 776, 103 S.Ct. at 1562. This could cause "the available resources [to] be spread so thin that [the Corps in this case would be] unable ade-

quately to pursue protection of the physical environment and natural resources." *Id.* In *Metropolitan Edison* the Supreme Court found it could not "attribute to Congress the intention to ... open the door to such obvious incongruities and undesirable possibilities." *Id.* (quoting *United States v. Dow*, 357 U.S. 17, 25, 78 S.Ct. 1039, 1046, 2 L.Ed.2d 1109 (1958)).

This court reaches the same conclusion in this case. The relevant statutes do not reveal an intention to empower the Corps to decide whether to issue permits based upon an assessment of economic effects unrelated to impacts on the natural environment. Nor do the relevant regulations reflect an intention to attempt to exercise such power. In the circumstances of this case the court will not attribute to Congress and the President the intention to delegate to the Corps the power to deny Mall Properties a permit because a mall anywhere in North Haven would, in its view, unduly injure the economy of New Haven while benefitting North Haven. Here, as in *Metropolitan Edison*, "the political process, and not [Corps proceedings] provides the appropriate forum in which to air [such] policy disagreements." *Id.* 460 U.S. at 777, 103 S.Ct. at 1563.

### D. *The Meeting with the Governor.*

■ The plaintiffs contend that the Corps did not act in accordance with law, but rather acted without observance of procedure required by law, when it failed to follow the procedures established by the relevant regulations relating to a meeting with the Governor of Connecticut. The Court agrees that the Corps did not follow the legally required procedures relating to the meeting. This too necessitates a remand.

On July 19, 1985 Colonel Sciple and William F. Lawless, Chief of the Regulatory Branch of the Corps, met with the Governor of Connecticut to discuss the position of the Governor on the construction of the mall. At that meeting the Governor "indicated that he felt it was not worth the risk to New Haven of building the North Haven Mall." ROD at 47. On August 25, 1985,

the Colonel issued his decision. The reference to the position of the Governor, expressed at their recent meeting, is the last factor mentioned before the Colonel stated that, "I have therefore concluded, that this project is contrary to the public interest and the permit is denied." *Id.*

The meeting between the Corps and the Governor was not itself prohibited as an *ex parte* contact. 33 C.F.R. § 320.4(j)(3) provides that: "[a] proposed activity may result in conflicting comments from several agencies within the same state. Where a state has not designated a single responsible coordinating agency, district engineers will ask the Governor to express his views or to designate one state agency to represent the official state position." Thus, the meeting itself was not improper.

An issue in this case, however, is generated by 33 C.F.R. § 325.2(a)(3), which states: "At the earliest practicable time, the applicant must be given the opportunity to furnish the district engineer his proposed resolution or rebuttal to all objections from other Government agencies." It is evident that the Colonel construed the Governor's comments as an objection to the proposed mall. It is undisputed that Mall Properties was not informed of the meeting or of the Governor's objection until after the final Record of Decision was issued. *See* Federal Defendant's Cross–Motion for Summary Judgment at 61.

The defendants claim, however, that no notification was necessary because the Governor merely reiterated a position which the state, through the Office of Policy and Management, had previously expressed. Defendants claim the Governor provided the Corps with no new factual information. At most, they argue, the Corp's failure to notify Mall Properties of the meeting was harmless error.

It is not certain at this point precisely what the Governor told the Corps and whether any of it was new in substance. The regulation, however, does not distinguish between new and old information. It states the "applicant must be given the opportunity to furnish the district engineer his proposed resolution or rebuttal to *all*

*objections* ... before final decision will be made on the application." 33 C.F.R. § 325.2(a)(3).

Nor can it be credibly claimed that the Governor's comments were immaterial. The most important issue emerging from the Corps' lengthy public interest review was whether New Haven's interests ought to be preferred over North Haven's interests. As indicated earlier, this is the type of political decision traditionally made by a Governor of Connecticut. The Corps has no special expertise in this area. The Governor's position, even if only a reiteration of the Office of Policy and Management's position, might understandably carry special weight with the Corps.

The Corps' decision was announced a month after it received the Governor's views and it followed them. The reference to the Governor's opinion in the penultimate sentence of the ROD indicates that the Governor had the last word and suggests that his objection to the mall was influential, if not decisive.

The relevant regulations required that Mall Properties receive notice of the Governor's objection so it could attempt to persuade him to revise his views or attempt to rebut any enduring objection. The Corps' failure to provide the legally required notice of the Governor's objection was not a harmless error.

### E. *Necessity for Remand.*

█ As indicated earlier, in denying Mall Properties a permit the Corps (1) improperly considered and gave the most significant weight to economic effects not proximately related to impacts on the physical environment and (2) improperly failed to give Mall Properties notice of the Governor's objection to the proposed mall. Each of these errors could have materially affected the Corps' decision whether to issue the permit. It is uncertain, however, whether the requested permit would have been issued in the absence of either or both errors. In the course of this case Mall Properties agreed that remand to the Corps, rather than an injunction ordering issuance of a permit, would be the appropriate remedy if

it prevailed. Remand to the Corps is now necessary and appropriate. *See generally Faulkner Hospital Corp. v. Schweiker,* 537 F.Supp. 1058, 1071 (D.Mass.1982), *aff'd,* 702 F.2d 22 (1st Cir.1983); *Quincy Oil, Inc. v. FEA,* 468 F.Supp. 383, 387–88 (D.Mass.1979).

## IV. ORDER

For the foregoing reasons, this action is hereby REMANDED to the United States Army Corps of Engineers for further proceedings consistent with this decision.